**BELTRONICS, INC., a Colorado corporation, et al., Plaintiffs,**

v.

**EBERLINE INSTRUMENT CORPORATION, a New Mexico corporation, et al., Defendants.**

**Civ. A. No. C–1598.**

United States District Court,
D. Colorado.

Dec. 3, 1973.

Dwight A. Hamilton and John T. Willson, of Fuller & Evans, Denver, Colo. for plaintiffs.

Robert C. Poole and Robert W. Harris, of Poole, Tinnin, Danfelser & Martin, Albuquerque, N. M., for defendants Eberline Instrument Corp., and Capco. Inc.

Stuart S. Gunckel and Robert A. Dick, of Rovira, DeMuth & Eiberger, Denver, Colo., for defendant, Western Elec. Co., Inc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CHILSON, District Judge.

### STATEMENT OF THE CASE

This action came on for trial to the Court without a jury on the 12th day of November, 1973, and was concluded on November 26, 1973.

The Court after hearing the evidence, the argument of counsel and having received written briefs of the parties, took the case under advisement for the purpose of preparing written Findings of Fact and Conclusions of Law.

This action arose out of a series of transactions whereby the plaintiff Beltronics and the defendants, Eberline and Capco, undertook to supply Western Electric with certain devices called "capacitors" and "capacitor cases" for use by the Bell Telephone System.

The issues submitted to the Court for determination can best be defined after setting forth the Findings of Fact. Most of the material facts are not in dispute and in those areas where the material evidence is in conflict, these Findings of Fact reflect the Court's resolution of those conflicts.

### FINDINGS OF FACT

The Bell Telephone system consists of twenty-three operating companies which are subsidiaries of the American Telephone and Telegraph Company. (A.T. & T.)

The defendant, Western Electric Company (Western Electric) is a wholly-owned subsidiary of A.T. & T. One of its principle functions is to purchase supplies, equipment, and materials for use in the Bell system.

One of the means of accomplishing this purpose is by supply contracts entered into between Western Electric and suppliers by which a supplier agrees to sell its products to Western Electric, upon order, at stated prices and in accordance with stated specifications to control the quality of the products.

The supply contract by its terms is for a limited period of time and provides no right of renewal by either party, but ordinarily if performance has been satisfactory, and if the price for the product can be agreed upon, the supply contract is renewed or a new supply contract is entered into for another specific period of time.

For some years prior to 1960, the plaintiffs, King and Peterson had sold capacitors manufactured by Goodall Electric Company, to some of the operating companies of the Bell system.

In 1960, Midwec Corporation of Oshkosh, Nebraska, began to manufacture capacitors. Midwec Corporation entered into an Agreement with Midwec Sales Co., a company controlled by King and Peterson, whereby Midwec Sales would act as the exclusive sales representative of Midwec Corporation in the sales of capacitors and capacitor cases. In the name of Midwec Sales, King and Peterson continued to sell capacitors and capacitor cases to the operating companies of the Bell system until 1962.

In 1961, Western Electric advised Midwec Corporation that the magnitude of the sales to the Bell operating companies required the development of specifications for the products and a supply contract with Western Electric.

After tests of the products by the Bell Telephone Laboratory specifications were prepared, tests were made and in March 1962 Midwec Corporation and Western Electric entered into a supply contract. Midwec Sales Company continued to be the exclusive sales representative of Midwec Corporation for the sale of the capacitors until September 1967, when the contract between Midwec Corporation and Midwec Sales Corporation was terminated by mutual agreement.

In 1966, Western Electric expressed to Midwec Sales a desire for a second source of supply of the products to avoid overdependence on Midwec Corporation for a supply of capacitors and cases.

When Midwec Corporation and Midwec Sales terminated their Agreement in 1967, King proposed to Eberline that it manufacture the capacitors and capacitor cases and thereby become the second source of supply of these products to Western Electric.

After lengthy negotiations, a plan was adopted and carried out by which Eberline acquired Capco, Inc., a Texas Corporation with a plant at Lubbock, Texas, to manufacture the capacitors and capacitor cases and Eberline also acquired all of the stock of Midwec Sales Company (whose name was changed to Beltronics, Inc.) and Beltronics was made the marketing organization. King and Peterson became the principal officers of Beltronics.

Basic to this plan, was the knowledge of the parties that the market for the products was limited almost entirely, if not entirely to Western Electric and that without a supply contract with the Western Electric Company, the venture could not succeed. The plaintiffs, Eberline and Capco, in entering upon this venture, acted upon the basic assumption that a supply contract with Western Electric would be obtained and maintained. This basic assumption was also implicit in the modification of the venture in January 1969 when the parties modified their original Agreement by the execution of Exhibits A and B referred to later in these Findings.

Once the plan was adopted, Beltronics began negotiations with Western Electric for a supply contract with the expectation that such a contract would be executed by May 1, 1968. Due to the failure of one of the products to meet the tests required by Western Electric, and due to some confusion at Western Electric of the relationship of Beltronics, Eberline, and Capco to each other and which entity should be the contracting party, the Eberline contract was not executed until August 1968. Eberline was the contracting party and the contract expired by its terms on April 30, 1969.

Upon the execution of the supply contract, Capco produced the products and Beltronics took charge of the marketing of the products under the supply contract.

In the course of time, Eberline became dissatisfied with the expense incurred by Beltronics and desired to shift the burden of the sales expense to those doing the selling. As a result of negotiations had in December 1968, King and Peterson agreed to purchase from Eberline all of the Beltronics stock for certain considerations including an agreement by Eberline and Capco that for a period of five years, and an option for a five-year extension, Beltronics would be the exclusive sales representative for the sale of the capacitors and capacitor cases to the telephone industry and would receive a commission of 15% on such sales. In January 1969, written agreements to effect these modifications of the original plan were executed. (Exhibits A and B.)

In its capacity as exclusive sales representative, Beltronics through its President, Mr. King, pursued negotiations for a new supply contract with Western Electric to become effective May 1, 1969, when the then existing supply contract expired.

In late February 1969 at the request of Western Electric, Beltronics submitted a new price quotation for a supply contract for the period from May 1, 1969, to May 1, 1970. Not having heard from Western Electric after the submission of this quotation, King in early April, went to New York to inquire about the new supply contract. On April 2, he was informed by Mr. Tubman of Western Electric, that the supply contract would not be renewed.

King immediately appealed to Mr. Tubman's superior, Mr. Lander, who said he would let King know the following week if anything could be done. When King telephoned Lander the following week, Lander informed him the decision not to renew the supply contract would stand.

At this time, King knew or had reason to believe that the decision of Western Electric not to renew the supply contract was motivated by alleged improper conduct on the part of the King which violated Western Electric policy with regard to entertainment of and the giving of gifts to its employees. King told Lander that he would resign as President of Beltronics and let Peterson take over if that would save the supply contract. Lander agreed to talk to Peterson and a meeting in New York was scheduled for April 4, 1969.

Eberline and Capco were advised of the situation and arranged for Mr. Vance and Mr. McGonagle (President and Vice President of Eberline) and Mr. Wood, President of Capco to attend the meeting with Mr. Peterson.

At the meeting of April 14, Western Electric spokesmen made it clear that Western Electric would do no further business with Mr. King or Beltronics or anyone associated with them.

Upon Eberline's assurance that its relationship with Beltronics as a subsidiary of Eberline had been terminated and that Eberline would have no association with Beltronics in the future, Western Electric accepted a quotation from Eberline in lieu of the one previously submitted by Beltronics and eventually Eberline received a supply contract from Western Electric.

On April 21, 1969, Eberline and Capco advised Beltronics that because of Western Electric's refusal to do business with Beltronics and Mr. King, Eberline and Capco "_  _  _ have elected to rescind the captioned agreement (the exclusive sales representative agreement) on the ground, among others, of complete failure of consideration on the part of Beltronics and impossibility of performance by Beltronics." (Exhibit S.)

Eberline and Capco did not comply with the termination provisions of paragraph 16a of the Agreement, which provided for termination prior to the expiration of the ten-year term of the Agreement upon ninety days notice and payment to Beltronics of $75,000.00.

The decision of Western Electric not to renew the Eberline supply contract was made about the middle of March 1969 by Mr. Bredder, then General Manager of purchasing for Western Electric, after reviewing the matter with the Vice President of Purchasing. The decision was made unilaterally by Western Electric without prior consultation with Beltronics, Eberline, or Capco. The decision was first revealed by Mr. Tubman of Western Electric to Mr. King at a meeting with Mr. King in New York on April 2, 1969.

The reasons which motivated Mr. Bredder's decision were three:

1. Alleged violations by Mr. King of Western Electric's entertainment and gift policies;
2. Mr. King's alleged improper acquisition of an "Index of Purchase Contracts" published by Western Electric for internal use and Mr. King's alleged improper use thereof;
3. Uncertainty of the respective roles of Beltronics, Eberline and Capco and confusion as to which should be the contracting party.

## VIOLATIONS OF ENTERTAINMENT AND GIFT POLICIES

On February 27, 1969, one S. Frank Artale, an employee in the purchasing organization of Western Electric gave to Western Electric a written statement (Exhibit ZZZ) which among other things, stated that Mr. King, President of Beltronics, had on two occasions paid for a "dinner at the Tower Suite for four people, my mother, father, wife, and myself. I provided verbally to King data concerning price quotes concerning build-out capacitors. _ _ _ I did this at King's suggestion and in a way to more or less pay him back for his hospitality. I presently have from King an additional complimentary charge ticket for the Tower Suite that I had planned to utilize on March 22, 1969."

This was in violation of Western Electric's entertainment policy. King, while admitting some entertainment of Mr. Artale including providing once for dinner at the Tower Suite for Mr. Artale and his family, denied that he knew that this was in violation of Western Electric's policy.

## INDEX OF PURCHASE CONTRACTS

Western Electric publishes monthly, an "Index of Purchase Contracts", which furnishes the names of those having supply contracts with Western Electric. These are distributed to the various purchasing houses of the Western Electric system and this index is used in ordering supplies, equipment, and materials.

After Eberline obtained its supply contract in August 1968, there was a delay in including Eberline's supply contract in the index and it was not until November of 1968 that Eberline was listed.

In the meantime, Mr. King was of the opinion that the absence of Eberline from the index was affecting the volume of orders received by Beltronics. He complained to various Western Electric representatives about the matter including a Mr. Dunton, who was in the purchasing department of Western Electric. Mr. Dunton looked at his copy of the index and noticing that it was not the current one threw it in the waste basket near where Mr. King was sitting. When Mr. King left Mr. Dunton's office, he took the index from the waste basket without asking Mr. Dunton for permission to do so.

Mr. King had Eberline's name inserted on pages 21 and 24 of the index, had the altered pages duplicated and sent them to the buyers of Western Electric houses throughout the country.

Western Electric deemed this to be an improper acquisition of an internal and confidential document and an improper use thereof.

King justified his acquisition and use of the index because Western Electric had not included Eberline in its index after the supply contract was executed.

## UNCERTAINTY OF RELATIONS BE-TWEEN BELTRONICS, EBERLINE AND CAP-CO

That there was ground for confusion on the part of Western Electric as to the relationship of these three companies is sustained by the evidence. The supply contract itself designates Beltronics as the manufacturer of the products when the truth is that Capco was the manufacturer and Beltronics was the marketing organization.

The Court finds that Western Electric in March 1969, had reasonable grounds to believe that Mr. King had violated the entertainment and gift policy of Western Electric; that Mr. King had improperly acquired and used the "Index of Purchase Contracts" and that there was uncertainty as to the relationship among Beltronics, Eberline, and Capco.

The Court finds that the decision of Western Electric in March 1969 to refuse to deal with Mr. King or Beltronics or anyone associated with them, including Eberline, was unilaterally made by Western Electric and that it was not made in accordance with any plan, scheme, or design by Western Electric or by Eberline and Capco or by a combination of the three to suppress competition or to restrain or to monopolize trade in violation of the Federal Anti-Trust Laws.

### .PLAINTIFFS' CLAIMS

The plaintiff has alleged four statements of claim. A summary of each of these claims is found at Page 1 of the plaintiffs' trial brief filed November 5, 1973, and succinctly states the nature of each claim. We here incorporate the plaintiffs' summary as a prelude to our conclusions of law.

"*First Claim*—Plaintiff Beltronics, Inc. ("Beltronics") charges Defendants Eberline Instrument Corporation ("Eberline") and Capco, Inc. ("Capco") with a breach of an Exclusive Sales Representative Agreement between Beltronics, and Eberline and Capco, Exhibit A to the Complaint,

and seeks $75,000.00 plus sales commission of $9,553.97 pursuant to Section 16(a) of that Agreement.

"*Second Claim*—In the event relief is denied on the First Claim, Plaintiff Beltronics seeks cancellation of a promissory note given by Beltronics to Capco, and Plaintiffs W. Arthur Peterson ("Peterson") and James E. King ("King") seek cancellation of their guarantees of said promissory note, all on the grounds that the consideration for the promissory note and the guarantees thereof has failed.

"*Third Claim*—Plaintiff Beltronics charges Defendant Western Electric Company, Incorporated ("Western Electric") with maliciously, intentionally, and without legal justification, interfering with the contractual relationship which existed between Beltronics, and Eberline and Capco, which relationship was evidenced by the Exclusive Sales Representative Agreement, Exhibit A to the Complaint, and seeks damages of $650,000.00.

"*Fourth Claim*—Plaintiff Beltronics charges Defendants Western Electric, Eberline and Capco with violations of Section 1 of the Sherman Act, and Defendant Western Electric with violation of Section 2 of the Sherman Act, and seeks single damages of $650,000.00, trebled to $1,950,000.00, plus reasonable attorney's fees and costs of suit."

### CONCLUSIONS OF LAW

FIRST CLAIM—Breach of Contract.

This claim is predicated on an alleged breach of the Exclusive Sales Agreement (Exhibit A) in that the defendants Eberline and Capco did not terminate the agreement in the manner specified by Section 16a which provides in its pertinent parts as follows:

"In addition to the option to terminate this Agreement under certain conditions as provided in paragraph 15, Eberline may terminate this Agreement at any time by giving Bel-

tronics notice in writing of termination at least ninety (90) days prior to the termination date and by paying Beltronics the sum of $75,00.00.

- - -

Admittedly, Eberline and Capco did not comply with this provision of the contract.

The question is whether or not this constitutes an actionable breach of the contract.

■ The Court found as a matter of fact that the parties in executing Exhibit A did so upon the basic assumption that Western Electric, which was the only market of any consequence for the products here involved, would continue to be a market for those products and that without Western Electric as a market the venture could not succeed.

The refusal of Western Electric to deal with Beltronics or Mr. King or with Eberline, so long as it was associated with them, made performance of the Exclusive Sales Agreement impossible.

Upon the facts as found by the Court, the Court concludes as a matter of law that Exhibit A was subject to an implied condition that if, without fault of the parties, the Western Electric market ceased to be available for the sale of the products, the Agreement would be dissolved and the parties excused from performing it.

■ The Western Electric market was foreclosed by the unilateral action of Western Electric, without fault on the part of Eberline and Capco, and the implied condition of · the Agreement caused the Agreement to be dissolved, and excused the parties from further performance. Thus, Eberline and Capco were not required to comply with Section 16a of Exhibit A and their failure to do so does not constitute an actionable breach of the Agreement.

The Court concludes that the plaintiff is not entitled to recover upon its First Claim.

SECOND CLAIM—Cancellation of Note

■ This claim is an alternative claim in the event the plaintiff is denied relief on the first claim.

The disposition of this claim requires some additional findings of fact.

The second claim for relief seeks a cancellation of a promissory note executed by Beltronics to Capco dated December 31, 1968. The payment of this note was guaranteed by King and Peterson personally in the Agreement of January 1, 1969, (Exhibit B) wherein King and Peterson agreed to purchase all of the stock of Beltronics from Eberline and Capco.

The Court finds from the evidence that in the course of its operations as a subsidiary of Eberline, Beltronics became indebted to Capco and that the parties agreed that the amount of such indebtedness as of December 31, 1968, was $21,970.85, and to evidence that indebtedness, Beltronics executed and delivered to Capco its promissory note for that amount dated December 31, 1968. The execution of the note was a recognition by Beltronics of the indebtedness of Beltronics to Capco existing at that time.

The Court further finds that King and Peterson prior to the execution of the purchase of stock agreement of January 1, 1969, (Exhibit B) had no personal liability for that indebtedness. By the terms of the purchase agreement (Exhibit B) King and Peterson personally guaranteed the payment of the note.

The Court finds that the obligation of Beltronics upon the promissory note which it executed on December 31, 1968, is supported by adequate consideration received by Beltronics prior to the execution of Exhibit B in January of 1969.

Upon the facts as found by the Court, the Court concludes as a matter of law that Beltronics is not entitled to a cancellation of the note and the indebtedness represented thereby and the counterclaim of Capco for judgment on the note against Beltronics should enter.

SECOND CLAIM—Cancellation of the Personal Guarantee of King and Peterson

■ Prior to the execution of the purchase agreement of January 1, 1969, (Exhibit B) whereby King and Peterson agreed to purchase the Beltronics stock from Eberline, King and Peterson had no personal liability for the debts of Beltronics.

The purchase agreement (Exhibit B) provides:

"In consideration of the mutual agreements wherein Buyers (King and Peterson) recognize this obligation (the note) on behalf of Beltronics and jointly, severally, and personally guarantee payment of the aforesaid note."

This is the only basis for a personal liability of King and Peterson to pay the indebtedness represented by the note.

We have previously found that from its inception, the venture entered into between Beltronics, Eberline, and Capco was based on the assumption that a supply contract with Western Electric would be obtained and maintained.

This basic assumption remained the foundation for the dealings of the parties in January 1969, when the parties executed Exhibit B whereby King and Peterson agreed to purchase the stock of Beltronics and when the parties executed Exhibit A, the exclusive sales representative agreement.

From the evidence, the Court finds that the consideration for the guarantee by King and Peterson was the exclusive sales agreement which the parties assumed would remain in force and effect for a minimum of five years and a maximum of ten years.

Upon these facts, the Court concludes as a matter of law that there was a failure of consideration for the guarantee of the note by King and Peterson and they are entitled to judgment for cancellation of their guarantee.

THIRD CLAIM

■ The third claim seeks to recover from Western Electric damages for a wrongful, malicious, and intentional inducement of a breach of the exclusive sales agreement between Beltronics and Eberline and Capco. Upon the facts as found by the Court, the Court concludes as a matter of law that the plaintiff is not entitled to recover upon its third claim; that the refusal of Western Electric to deal with the plaintiff or anyone associated with it was an exercise of a legal right and such refusal was not illegal or unlawful, was not tortious and is not actionable.

FOURTH CLAIM—Anti-Trust Violations

Under the facts as found by the Court, the Court concludes as a matter of law that the plaintiff is not entitled to recover upon its fourth claim based on alleged violations of Sections 1 and 2 of the Sherman Act.

■ The facts as found by the Court do not support plaintiff's allegations that Western Electric, Eberline, and Capco contracted, combined, or conspired in restraint of interstate trade in violation of Section 1 of the Sherman Act; or that they contracted, combined, or conspired in a group boycott of Beltronics in violation of Section 1 of the Sherman Act; or that Western Electric in providing a source of supply of capacitors for the Bell system, exercised a monopoly power in violation of Section 2 of the Sherman Act.

Upon the facts as found by the Court, the Court concludes as a matter of law:

A. That Western Electric had a legal right not to deal with Beltronics and its exercise of that right did not violate Sections 1 or 2 of the Sherman Act.

B. That the acts of the defendants as found by the Court did not constitute a violation of Sections 1 or 2 of the Sherman Act.

■ C. Assuming arguendo that the acts of the parties or any of them were in violation of either Sections 1 or 2 of the Sherman Act, the injury and damage

304

suffered by the plaintiff were not proximately caused by any unlawful restraint or monopolization of trade in violation of Sections 1 and 2 of the Sherman Act, but were proximately caused by Western Electric's exercise of its legal right to refuse to deal with Beltronics or with Eberline and Capco so long as they were associated with Beltronics.

D.  That the plaintiff is not entitled to recover on its fourth claim for relief.

## ORDER

It is therefore ordered, adjudged and decreed, that judgment of dismissal of all claims of Beltronics shall be entered and that the defendants have judgment against Beltronics for their costs to be taxed by the Clerk of the Court upon the filing of a Bill of Costs.

It is further ordered, adjudged, and decreed that the guarantee by the plaintiffs, King and Peterson, of payment of the promissory note executed by Beltronics to Capco, Inc. dated December 31, 1968, in the principal amount of $21,970.85, is hereby set aside and cancelled and said plaintiffs are absolved from any obligation for the payment of that indebtedness by virtue of their guarantee.  King and Peterson shall have judgment against Capco, Inc. for their costs to be taxed by the Clerk of the Court upon the filing of a Bill of Costs.

It is further ordered, adjudged, and decreed that judgment be entered in favor of Capco, Inc. and against Beltronics for the indebtedness represented by the promissory note executed by Beltronics to Capco, Inc. and dated December 31, 1968, which amount has been stipulated by the parties to be $8,617.11 after allowing all just credits, together with the interest accrued thereon.  Judgment shall be entered upon the surrender to the Clerk of this Court of the original promissory note and a stipulation by the interested parties of the interest due and owing upon the agreed principal amount.