174 N.J. Super. 560 (1980)
417 A.2d 79
HOWARD S. LEVIN, PLAINTIFF-APPELLANT,
v.
KUHN LOEB & CO., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 1979.
Reargued June 2, 1980.
Decided June 12, 1980.
*561 Before Judges SEIDMAN, MICHELS and FURMAN.
Stanley Weiss argued the cause for appellant (Carpenter, Bennett & Morrissey, attorneys; Dean R. May, on the brief).
Peter N. Perretti, Jr. argued the cause for respondent (Riker, Danzig, Scherer, Debevoise & Hyland, attorneys; Susan Scott, on the brief).
*562 The opinion of the court was delivered by MICHELS, J.A.D.
Plaintiff Howard S. Levin appeals from a judgment of involuntary dismissal entered by the Law Division in favor of defendants Kuhn Loeb & Co. at the conclusion of the presentation of his evidence.
Plaintiff instituted this action to recover damages allegedly "caused by defendant's malicious interference with the pursuit of [his] career in the short term leasing of computers manufactured by International Business Machines [IBM]." In the complaint filed herein plaintiff claimed that he developed and pioneered a new business program consisting of the acquisition of computers from IBM and the short-term leasing of them in competition with IBM's leasing activities. He further claimed that he pursued the computer leasing business first as an independent proprietor and then in partnership with James E. Townsend. Finally, he and Townsend formed Levin-Townsend Computer Corporation (Levin-Townsend), a New Jersey corporation, to implement the program. Plaintiff served as president and as director of Levin-Townsend and its various subsidiaries and owned substantial stock in Levin-Townsend.
Plaintiff claimed that through his good offices and favorable recommendation defendant, a New York investment banking firm, which was interested in obtaining the position as Levin-Townsend's investment banker, received all of the investment banking business of Levin-Townsend that it sought and, for substantial compensation, participated as major underwriter and dealer-manager in numerous public offerings by Levin-Townsend. Plaintiff also claimed that defendant served as financial advisor for him personally and breached the fiduciary duty and obligation that it owed to him. Plaintiff charged that during an 18-month period in 1969 and 1970 defendant was engaged in a course of conduct that operated as a fraud upon him, was maliciously intended to interfere with his business relationships *563 and prospective economic advantage and caused severe economic loss to him and to his business and credit reputation. Specifically, he charged that in mid-March of 1969, after involving Levin-Townsend in extensive financial commitments, defendant withdrew its role as investment banker for and its financial support of Levin-Townsend. This caused Levin-Townsend to seek alternative financing sources to meet its financial commitments under disadvantageous circumstances, which severely damaged Levin-Townsend, created a financial and management crisis and resulted in a major irretrievable decline in the market price of Levin-Townsend securities. Plaintiff claimed that as a result of defendant's conduct he was removed by the directors of Levin-Townsend from his position as president.
Following extensive pretrial discovery proceedings, defendant moved for summary judgment on several grounds, and plaintiff filed a cross-motion for partial summary judgment on liability. The trial judge, applying the substantive law of New York, granted defendant's motion with respect to any claim based on an alleged breach of fiduciary duty. The judge held that defendant's refusal to consummate the proposed underwriting of Levin-Townsend securities did not constitute a breach of any fiduciary duty defendant may have owed to plaintiff by virtue of the fact that defendant served as financial advisor for him personally. However, the judge found that there was an issue of fact as to whether defendant's refusal to consummate the underwriting was malicious and therefore denied its motion for summary judgment with respect to the claim based on malicious interference with prospective economic advantage. The judge also held that the damages recoverable in the action were limited to the emoluments that would have flowed to plaintiff from his employment with Levin-Townsend as well as those that were reasonably foreseeable from a breach thereof, and that plaintiff was precluded from recovering damages for any loss suffered as a result of the decline of the value of his Levin-Townsend stock. Plaintiff's cross-motion for partial summary judgment was denied.
*564 Plaintiff established at trial that he was a pioneer in the short-term computer leasing industry and that in 1963, with Townsend, he founded Levin-Townsend. He served as its president and as a director from its creation until January 16, 1970 when the board removed him as president. He continued to serve as a director until April 1971.
Sometime in mid-1967 defendant, a Wall Street banking house, became Levin-Townsend's investment banker and undertook to perform certain investment advisory and financial services for the corporation. Prior to that time Levin-Townsend had dealt with numerous underwriters in connection with its public offerings, but had not established an investment banking relationship with any of them. In February 1968 Thomas E. Dewey, Jr., a partner in the Kuhn Loeb firm, was elected a director of Levin-Townsend. Defendant also undertook to advise plaintiff with respect to his personal financial business and managed a secondary offering of Levin-Townsend stock for plaintiff and others in the amount of $8,750,000. In July 1968 defendant managed a $20,000,000 debenture offering and in August 1968 a $15,000,000 debenture offering for Levin-Townsend.
In the latter part of 1968 Levin-Townsend was approached by another investment banking house concerning possible acquisition of National Equities, Inc., a large diversified holding company, which owned extensive real properties in Las Vegas, Nevada, and Toronto, Canada. Dewey, who supported diversification of Levin-Townsend's holdings outside of the computer industry, looked favorably on this acquisition. Levin-Townsend acquired National Equities, Inc., expending $10,970,000 in cash to acquire the majority shareholders' stock, and made an exchange offer of $26,975,700 of its securities for the publicly-held National Equities stock. Levin-Townsend also guaranteed substantial amounts of short-term debt of National Equities. During this same period defendant discussed the management of a $65,000,000 debenture offering on behalf of Levin-Townsend. The purpose of this offering was to finance the continued growth of the company and enable it to diversify its activities into non-computer related businesses. This offering was later *565 reduced to $35,000,000 due to unfavorable market conditions, and in January 1969 a registration statement covering the prospective $35,000,000 offering was filed with the Securities and Exchange Commission. The offering was to become effective during the week of March 18, 1969.
In early 1969 plaintiff began spending more time in Las Vegas because the National Equities properties located there presented a serious cash problem to Levin-Townsend, projecting losses totalling $3,000,000 a year. While in Las Vegas plaintiff became involved in discussions with, among others, Kirk Kerkorian and Nathan S. Jacobson concerning possible acquisition of a 17-acre site of land known as The Bonanza (the site now of the MGM Grand Hotel), including a nonoperating casino and a small motel-hotel type building. The Bonanza was owned by Kerkorian's Tracey Investment Company. Jacobson was the head of Caesar's Palace, a Las Vegas gambling casino. On or about March 11, 1969, while the registration statement was still pending before the Securities and Exchange Commission, plaintiff, without approval from the Levin-Townsend board, authorized Jacobson to enter into a contract as nominee of Levin-Townsend to purchase The Bonanza for $10,603,200. According to plaintiff:
Jacobson wanted the property for us. He wanted it for himself if we didn't. We had met and talked and in order to preserve any interests of Levin-Townsend in the transaction, it was necessary to make a good faith deposit so that The Bonanza was, basically, held for a $250,000 fee, subject to a late closing if Levin-Townsend decided to go forward. If Levin-Townsend did not go forward its liability would be limited to that $250,000.
Plaintiff also paid Tracey Investment Company the $250,000 deposit without approval from the Levin-Townsend board.
On or about March 13 or 14, 1969 plaintiff discussed the acquisition of The Bonanza with Dewey, who had expressed his reservations generally about gambling in Las Vegas. Plaintiff asked Dewey to keep an open mind, meet Jacobson, go to Las Vegas to take a look at it, and then make up his own mind. Later that day plaintiff, Jacobson and Dewey met in New York and discussed the acquisition of The Bonanza. At the conclusion of the meeting Dewey agreed to go with plaintiff the following *566 week to investigate The Bonanza acquisition. However, on March 14, 1969 plaintiff, again without approval from the Levin-Townsend board, sent a letter to Jacobson confirming the latter's designation as nominee of Levin-Townsend to purchase The Bonanza, and authorizing Jacobson to spend up to $1,000,000 of Levin-Townsend's money in connection with the hiring of employees, architects and others to refurbish The Bonanza. Plaintiff further authorized Jacobson to file applications for liquor and gambling casino licenses for The Bonanza. On March 14, 1969 an amendment to the registration statement was filed with the Securities and Exchange Commission lowering the prospective offering to $20,000,000. The amendment made reference to Levin-Townsend's agreement to acquire The Bonanza, indicating that "The Company contemplates using funds to be obtained from sources other than the proceeds of this offering to meet its obligations under that agreement, including the obligation to pay $2,750,000 on or before March 28, 1969."
Plaintiff and some of the members of the Levin-Townsend board were fully aware that defendant was deeply concerned about underwriting a public offering for a gambling enterprise acquisition in Las Vegas, and that the proposed acquisition of The Bonanza might adversely affect its pending underwriting. Plaintiff admitted that Dewey told him that he, Dewey, and his firm "had reservations, deep reservations about gambling." Moreover, plaintiff conceded that if he could not persuade Dewey, he would have to abandon the deal, as clearly appears from the following testimony:
Q. You indicated earlier this morning you had acquired an understanding from Mr. Dewey that if you couldn't persuade Mr. Dewey you might have to abandon the deal. Right?
A. That's correct.
Q. Mr. Levin, when you had left you knew in no uncertain terms, in advance, that Kuhn Loeb was very, very concerned about doing underwritings for Las Vegas gambling?
A. Well, that's a different characterization than I testified to, but I knew that it would be necessary to persuade Mr. Dewey.
Moreover, William Dillon, a member of the Levin-Townsend board and a partner in the New York law firm of Simpson, Thatcher & Bartlett, which represented the corporation, admitted *567 that prior to March 1969 Dewey informed him that defendant "didn't like to do underwritings for companies that were involved in the gambling business"; that "they didn't like to take that paper to the public," and implied that "if Levin forced its company into an acquisition of a casino in Las Vegas it would affect the underwriting."
Notwithstanding the fact that plaintiff knew full well the possible consequences attendant the acquisition of The Bonanza, he, without approval of the board, authorized Jacobson to sign the March 11, 1969 contract as nominee for Levin-Townsend, paid the owners of Bonanza a deposit of $250,000 with corporate funds and on March 14, 1969 authorized Jacobson to expend up to $1,000,000 of corporate funds to refurbish the property.
While Dillon knew generally about The Bonanza transaction prior to Sunday, March 16, 1969, he was not informed of the details of the transaction and apparently had not seen the March 11 contract. That night, Dillon spoke with Townsend and advised him that the board should get together promptly during the coming week and discuss and resolve any questions relating to The Bonanza. On the morning of March 17, 1969, Harvey Krueger, a partner of defendant, called Dillon and requested that Dillon come to a meeting that day at defendant's New York office. Dillon refused, suggesting that representatives of Levin-Townsend should be contacted and present first. Thereafter, either Dewey or Krueger called again and confirmed that Townsend and Frank McShane, a director, officer and house counsel of Levin-Townsend, were present. When Dillon arrived at defendant's offices, he met Dewey and Krueger and two representatives from Dewey, Ballantine, Bushby, Palmer & Wood, the New York law firm which represented defendant with respect to public offerings; Townsend and McShane, and a representative from Cravath, Swain & Moore, the New York law firm which represented IBM, a very large creditor of Levin-Townsend. Plaintiff and William T. Robbins, another director, were not present. Krueger, who was the principal spokesman for defendant, expressed defendant's displeasure with the proposed Bonanza transaction. While the record is somewhat unclear as to *568 what was said by each participant at the meeting, it was apparent to Dillon that defendant was not going ahead with the offering, although no one specifically said that "the deal's off." Both Townsend and McShane expressed displeasure with the possibility of slowing down or calling off the public offering, and Krueger suggested the possibility of Townsend becoming president. Dillon suggested that any further discussion along these lines should take place at the corporate offices among the so-called "corporate family."
Later the same day Dillon attended a board meeting at Levin-Townsend's New York offices which was attended by plaintiff, Townsend, Dewey and McShane and Stanley Weiss and another representative of Carpenter, Bennett & Morrissey, the New Jersey law firm which at that time apparently was representing both plaintiff and Levin-Townsend. Again, the record is not entirely clear as to this. According to plaintiff, he met individually with each director prior to the meeting, including Dewey, who made it very clear that he, Dewey, did not want to work with him at all "in any way, shape or form." Plaintiff also testified that he was told that it was no longer possible for him to remain as president, and thereafter a proposal was made that Townsend become president. Townsend now advanced his candidacy for the presidency. There was also a discussion that plaintiff exchange his Levin-Townsend stock for certain non-computer assets of the company, such as those of National Equities, Inc. The meeting ended without the board reaching any decision on the matter.
The following day, on March 18, the board met again to discuss The Bonanza acquisition and resolved the problems created thereby by electing Elliott M. Wiener, the comptroller, to the Levin-Townsend board and forming an executive committee. Robbins was appointed chairman, and plaintiff, Townsend and Wiener were appointed to the committee. It was agreed that the executive committee would make all decisions relating to any acquisitions and that the four members would leave immediately for Las Vegas to investigate The Bonanza acquisition. The executive committee was to report to the board, and its *569 recommendations were binding. Since Dewey had left the meeting early, McShane called him to advise what had occurred. McShane gave plaintiff the impression that Dewey had acquiesced in the board's decision, and that defendant would therefore continue with the underwriting of the pending public offering.
On March 19, 1969 Dewey resigned as a director of Levin-Townsend, and defendant withdrew from the underwriting and ceased to be Levin-Townsend's investment banker. According to Dillon, he immediately called Dewey to discuss his resignation. Dewey told Dillon that the reasons for the action were that (1) defendant did not like gambling and therefore did not want to go ahead with the offering because of The Bonanza acquisition; (2) he could no longer work with plaintiff, and (3) there was an internal management conflict and crisis, and a disagreement and dispute in management which gave defendant genuine concern in terms of their "due diligence" obligations.[1]
Even though defendant had assembled an underwriting group to participate in the prospective offering, retained underwriting counsel and completed the "due diligence" work, Levin-Townsend and defendant did not have a binding contract for the consummation of the underwriting. Moreover, the underwriting contract which had been prepared, but not signed, contained the customary termination provision that:
11. Effectiveness and Termination of Agreement. This Agreement shall become effective at the time the Registration Statement shall become effective. Until this Agreement shall have become effective, it may be terminated (a) by you, as representative of the Underwriters, by giving notice to the Company or (b) by the Company by giving notice to you, as such representative. Any such notice may be in writing, or by telegraph or telephone confirmed in writing.
Notwithstanding the crisis of March 17 and 18, 1969, plaintiff remained as president of Levin-Townsend and its subsidiaries. *570 Furthermore, at the Levin-Townsend annual meeting in either May or June 1969, plaintiff was re-elected a director of the company and its president. The board also voted plaintiff a pay raise.
Levin-Townsend acquired The Bonanza, closing title at the end of March 1969 as required by the March 11 contract, and opened the casino about two months later. Jacobson had obtained the necessary casino gambling and liquor licenses by that time. However, The Bonanza was not profitable. It showed consistent monthly losses from July 1969 to and including February 1970, ranging from a high of $706,000 to a low of $112,000 a month. In addition, shortly after the casino was opened, plaintiff fired Jacobson and Levin-Townsend was compelled to settle with Jacobson.
On January 16, 1970, almost one year after defendant withdrew from the underwriting, the board of Levin-Townsend removed plaintiff as president of the company. Since plaintiff did not have an employment contract with Levin-Townsend, he could be removed at any time with or without cause pursuant to N.J.S.A. 14A:6-16. However, plaintiff remained on the board and continued to serve as chairman of the finance committee until his term expired. Following plaintiff's departure, defendant performed some investment banking services for Levin-Townsend.
At the conclusion of plaintiff's proofs Judge Thompson in the Law Division granted defendant's motion for a judgment of involuntary dismissal on the ground that plaintiff had failed to prove that defendant's conduct in March 1969 caused his removal as president of Levin-Townsend in January 1970, in part stating:
... there is no evidence whatsoever that at any time between the time Kuhn Loeb aborted the underwriting and Mr. Dewey resigned, and until the meeting of the Board of Directors in January of 1970, that Kuhn Loeb had any effect whatsoever on the Board. The inference which Mr. Weiss seeks to draw is that this was an open invitation; at any time that Mr. Levin left, Kuhn Loeb would come back, but no Director testified to that, and the evidence is quite clear that nothing was stated on the record at that meeting in January of 1970 with respect to the Board as to why Mr. Levin was dismissed. Therefore, we are left with a void as far as the evidence is concerned. There ... isn't one *571 word of testimony that at that time Kuhn Loeb was involved or that anybody from Kuhn Loeb had contacted the Board and suggested that such action be taken or that they would, in fact, have responded to such an overt act if one, in fact, had been forwarded.
Plaintiff appealed.
Plaintiff contends that the proofs were sufficient to support an inference that his removal as president of Levin-Townsend in January 1970 was causally related to defendant's wrongful conduct in March 1969, and that therefore the trial court erred in granting a judgment of involuntary dismissal. We disagree.
The test of causation with respect to torts of this general nature under New York law, which is controlling in this case, is set forth in Union Car Advertising Co. v. Collier, 263 N.Y. 386, 189 N.E. 463 (Ct.App. 1934):
A cause of action exists where an executed contract is broken by a third person's unlawful interference. Lamb v. S. Cheney & Son, 227 N.Y. 418, 125 N.E. 817. A cause of action has also been recognized where a party would have received a contract but for the malicious, fraudulent, and deceitful acts of a third party, such, for instance, as materially lying about him. Morgan v. Andrews, 107 Mich. 33, 64 N.W. 869; Debnam v. Simonson, 124 Md. 354, 92 A. 782; Skene v. Carayanis, 103 Conn. 708, 131 A. 497; Lewis v. Bloede (C.C.A.) 202 F. 7; Nims on Unfair Competition and Trade-Marks (3d Ed.) § 176, p. 484; May v. Wood, 172 Mass. 11, page 14, 51 N.E. 191. There must be some certainty that the plaintiff would have gotten the contract but for the fraud. This cannot be left to surmise or speculation. The courts rightfully extended the arm of the law to reach one who deliberately interfered with an executed contract (Lumley v. Gye, 2 E. & A. 216), since which time they have gone a step further and mulcted in damages him who does the same thing to one who would have received such a contract but for the illegal interference. (See above cases.) The courts will be a little slow in permitting juries to speculate upon what a competitor had reason to expect or might reasonably suppose would happen. The expressions "reasonable expectation" or "reasonably certain" may not be as precise as "would have received," and we think the latter words are preferable. While not finding reversible error in this part of the charge to the jury, yet we call attention to this phraseology in order that there may be no misunderstanding in the future. [189 N.E. 469-470]
This test is still viable and followed by the New York courts. See A.S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369, 144 N.E.2d 371, 375, 165 N.Y.S.2d 475 (Ct.App. 1957); Susskind v. Ipco Hospital Supply Corp., 49 App.Div.2d 915, 373 N.Y.S.2d 627, 629 (App.Div. 1975); Williams & Co. v. Collins, Tuttle and Co., 6 App.Div.2d 302, 176 N.Y.S.2d 99, 103-104 (App.Div. 1958); DeSantis *572 v. City of Troy, 83 Misc.2d 195, 371 N.Y.S.2d 310, 315-316 (Sup.Ct. 1975). See, also, Optivision, Inc. v. Syracuse Shopping Ctr. Ass'n, 472 F. Supp. 665, 685 (N.D.N.Y. 1979).
Viewing the proofs in a light most favorable to plaintiff (Davis v. Pecorino, 69 N.J. 1, 3 (1975); Dolson v. Anastasia, 55 N.J. 2, 5 (1969)), we are convinced that he failed to show that he would have been continued as president of Levin-Townsend had it not been for the conduct of defendant. While it may be inferred that defendant withdrew from the underwriting because the Levin-Townsend board continued plaintiff as president and determined to pursue the acquisition of The Bonanza notwithstanding defendant's expressed disapproval of the acquisition in light of the proposed public offering, its action did not cause plaintiff to be removed as president of Levin-Townsend. On the contrary, plaintiff continued to serve as president for almost a year thereafter. As pointed out above, in May or June 1969, after defendant had withdrawn from the underwriting, plaintiff was re-elected to the board and the board re-elected him president and gave him a raise. It was not until January 1970 that the board removed him as president. The record is absolutely barren of any evidence establishing the reasons for the board's action at that time, or that defendant interfered in any way thereafter with plaintiff's relationship with Levin-Townsend. Thus, while plaintiff established that defendant sought his ouster as president in March of 1969, no inference can be drawn that defendant's conduct caused plaintiff's subsequent removal in January 1970. See Joseph v. Passaic Hospital Ass'n, 26 N.J. 557, 574-575 (1958).
Beyond this, even if the less stringent New Jersey rule of causation were applicable, we would still hold that plaintiff failed to prove that if there had not been interference by defendant there was a reasonable probability that the board would have continued him as president of Levin-Townsend after January 1970. Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173, 185-186 (App.Div. 1978), certif. den. 77 N.J. 510 (1978); Myers v. Arcadio, Inc., 73 N.J. Super. 493, 497-498 (App.Div. 1962).
*573 Furthermore, even if we were to assume that defendant's withdrawal from the underwriting was the cause of plaintiff's later ouster as president of Levin-Townsend, which is clearly not supported by the proofs, plaintiff has failed to show that defendant's conduct was wrongful and without justification. He has not proved a prima facie case of malicious interference with prospective economic advantage. Malice is an essential element of this, as well as other torts of interference. Felsen v. Sol Cafe Mfg. Corp., 24 N.Y.2d 682, 249 N.E.2d 459, 461, 301 N.Y.S.2d 610, 613 (Ct.App. 1969); Union Car Advertising Co. v. Collier, supra, 189 N.E. at 469; Williamson, Picket, Gross v. 400 Park Ave. Co., 63 App.Div.2d 880, 405 N.Y.S.2d 709, 710-711 (App.Div. 1978), aff'd 47 N.Y.2d 769, 391 N.E.2d 296, 417 N.Y.S.2d 460 (Ct.App. 1979). The term "malice" as used in this context means the intentional commission of wrongful act without justification or excuse. Campbell v. Gates, 236 N.Y. 457, 141 N.E. 914, 915 (Ct.App. 1923); Williamson, Picket, Gross v. 400 Park Ave. Co., supra, 405 N.Y.S.2d at 711; Benton v. Kennedy-Van Saun Mfg. & Eng. Corp., 2 App.Div.2d 27, 152 N.Y.S.2d 955 (App.Div. 1956). See, also, 45 Am.Jur.2d, Interference, § 3 at 281; 4 Restatement, Torts 2d, § 766, Comment (s) at 16 (1979). This definition is also applied in New Jersey. Rainier's Dairies v. Raritan Valley Farms Inc., 19 N.J. 552, 563 (1955); Louis Schlesinger Co. v. Rice, 4 N.J. 169, 180 (1950); Leslie Blau Co. v. Alfieri, supra, 157 N.J. Super. at 185. Consequently, plaintiff had the burden of proving that defendant intentionally committed a wrongful act without justification when it withdrew from the underwriting. Felsen v. Sol Cafe Mfg. Corp., supra, 24 N.Y. 2d 682, 249 N.E.2d at 461, 301 N.Y.S.2d at 613. See, also, 4 Restatement, Torts 2d, § 766, Comment (s) at 16 and § 767, Comment (k) at 37-38 (1979).
The uncontroverted proofs show that defendant was not under a contractual obligation to complete the Levin-Townsend public offering. The proposed underwriting agreement, which had not been signed by Levin-Townsend and defendant, expressly provided that it "shall become effective at the time the Registration Statement shall become effective." The agreement *574 further provided that until it "shall have become effective, it may be terminated" by either party upon written or oral notice to the other. Hence, defendant plainly had the absolute right to withdraw from the underwriting. Since defendant had that right, the exercise thereof constituted ample justification for its action and cannot result in the imposition of tort liability. Zicos v. Telefood, Inc., 45 Misc.2d 64, 256 N.Y.S.2d 152, 154 (Sup.Ct. 1965); Cohen v. Brunswick Record Corp., 31 Misc.2d 525, 221 N.Y.S.2d 893 (Sup.Ct. 1961); Steward v. World-Wide Automobile Corp., 20 Misc.2d 188, 189 N.Y.S.2d 540, 549 (Sup.Ct. 1959); E.R. Squibb & Sons v. Ira J. Shapiro, 64 N.Y.S.2d 368 (Sup.Ct. 1945); 45 Am.Jur.2d, Interference, § 23 at 298-299; 4 Restatement, Torts, 2d § 766, Comment (j) at 13 (1979). See, also, Holman v. Coie, 11 Wash. App. 195, 522 P.2d 515, 526-527 (Ct.App. 1974), cert. den. 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975); Radiology Professional Corp. v. Trinidad, etc., 39 Colo. App. 100, 565 P.2d 952, 954 (Ct.App. 1977), aff'd 195 Colo. 253, 577 P.2d 748 (Sup.Ct. 1978). See, generally, Annotation, "Liability for procuring breach of contract," 26 A.L.R.2d 1227, § 23 at 1259-1260 (1952). As we appropriately stated in Rothermel v. International Paper Co., 163 N.J. Super. 235 (App.Div. 1978), certif. den. 79 N.J. 487 (1979):
Basic to our free enterprise system is the right to enter or to refrain from entering or continuing a contractual relationship. Rejection of an offer, or termination of a contract in accordance with its express terms, is a right the exercise of which is unencumbered by the threat of tort liability. This principle has received recognition in New Jersey law. As early as 1906, in Booth & Brother v. Burgess, 72 N.J. Eq. 181 (Ch. 1906), it was announced:
[There are] two principles which * * * are established beyond question. The first of these principles is the absolute right of all men to contract or refrain from contracting, which is one of the rights hereinbefore enumerated. The motives which actuate a man in refraining from making a contract in relation to labor or merchandise or anything else are absolutely beyond all inquiry or challenge. Self-evident as it may be, the proposition * * * has often been lost sight of that the right to refrain from contracting is an absolute right, which every man can exercise justly or unjustly, for a good purpose or for a bad purpose, "maliciously," in the popular sense of the term, or benevolently. [at 190]
That which one has a right to do cannot become a tort when it is done. In The Aalfo Co. v. Kinney, 105 N.J.L. 345 (E. & A. 1929), plaintiff had a five-year contract with Blake Mfg. Co. to purchase all whistles manufactured by Blake. During the term of the contract a Blake shareholder was allegedly induced by *575 other shareholders to institute dissolution proceedings in Chancery, as a consequence of which Blake was dissolved, its assets sold and Blake's performance of its contract with plaintiff was thereby thwarted. Plaintiff sued the other shareholders alleging a tortious interference with plaintiff's contract on the ground that dissolution had been sought to prevent performance of the contract. In stating that so much of the complaint as rested on the alleged act of persuading a fellow shareholder to institute Chancery proceedings disclosed no cause of action, the court observed:
[T]he motive of the defendants in persuading a fellow stockholder to institute the suit is immaterial, for they only persuaded him to do what they would have had a legal right to do themselves. * * * "The legal pursuit of one's right, no matter what may be the motive of the promoter of the action, cannot be deemed either illegal or inequitable." [At 349]
In O'Connor v. Harms, 111 N.J. Super. 22 (App.Div.), certif. den. 57 N.J. 137 (1970), the court held that members of a board of education had the right to vote on a contract with the plaintiff principal, and could not be held liable for interfering with his contract when they exercised that right. Law elsewhere is to the same effect. See, Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc., 531 F.2d 910 (8 Cir.1976); Beltronics, Inc. v. Eberline Instrument Corp., 369 F. Supp. 295 (D.Colo. 1973), aff'd 509 F.2d 1316 (10 Cir.1974), cert. den. 421 U.S. 1000, 95 S.Ct. 2399, 44 L.Ed.2d 667 (1975); Cunningham v. A.S. Abell Co., 264 Md. 649, 288 A.2d 157 (Md. Ct. App.), cert. den. 409 U.S. 865, 93 S.Ct. 160, 34 L.Ed.2d 114 (1972); House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2 Cir.1962); Emery v. A & B Commercial Finishing Co., 315 P.2d 950 (Okl. 1957); Green v. Victor Talking Mach. Co., 24 F.2d 378, 381-382 (2 Cir.), cert. den. 278 U.S. 602, 49 S.Ct. 9, 73 L.Ed. 530 (1928); McMaster v. Ford Motor Co., 122 S.C. 244, 115 S.E. 244 (1923); Carpenter, "Interference with Contract Relations," 41 Harv.L.Rev. 728 (1928).
The prevailing law in this respect has been synthesized in Restatement, Torts, § 762 at 37 (1939) as follows:
Privilege of selecting persons for business relations.
One who causes intended or unintended harm to another merely by refusing to enter into a business relation with the other or to continue a business relation terminable at his will is not liable for that harm if the refusal is not
(a) a breach of the actor's duty to the other arising from the nature of the actor's business or from a legislative enactment, or
(b) a means of accomplishing an illegal effect on competition, or
(c) part of a concerted refusal by a combination of persons of which he is a member. [At 244-246]
Consequently, we hold to the view that defendant's withdrawal from the underwriting was legally justified, and therefore, the trial judge should have granted the judgment of involuntary dismissal for this reason as well.
In reaching our decision to affirm the judgment, we have considered the other contentions raised by plaintiff and are satisfied that they are clearly without merit, R. 2:11-3(e)(1)(E). *576 We simply add that contrary to plaintiff's claim that he, as president of Levin-Townsend, had "an agency coupled with an interest" which entitled him to protection against removal as president is totally irrelevant to the issues raised here. In the first place, plaintiff did not have such an interest. An agency coupled with an interest is defined in Restatement, Agency 2d, § 138 at 337 (1958), as follows:
A power given as security is a power to affect the legal relations of another, created in the form of an agency authority, but held for the benefit of the power holder or a third person and given to secure the performance of a duty or to protect a title, either legal or equitable, such power being given when the duty or title is created or given for consideration.
See, also, 2 Williston, Contracts (3d Ed. 1959), § 280 at 296-307.
However, plaintiff has not shown that his employment as president of Levin-Townsend was "given to secure the performance of a duty or to protect a title," or that such power was given when the duty or title was created. There is simply no indication that his position as president of Levin-Townsend was designed to protect his interest in the stock of that company. See Becket v. Welton Becket & Associates, 39 Cal. App.3d 815, 114 Cal. Rptr. 531, 533 (D.Ct.App. 1974). See, also, Annotation "What constitutes power coupled with interest within rule as to termination of agency," 28 A.L.R.2d 1243, 1285-91 (1953). Secondly, even if plaintiff had established that he had such an interest, this would not operate to preclude defendant from withdrawing from the underwriting in the circumstances here present. It would merely have afforded plaintiff protection against Levin-Townsend, as principal, from revoking such agency. See Sarokhan v. Fair Lawn Memorial Hospital, Inc., 83 N.J. Super. 127, 135 (App.Div. 1964); 3 Am.Jur.2d, Agency, § 60 at 460-461 (1962).
Finally, we are convinced that the trial judge properly granted summary judgment in favor of defendant with respect to plaintiff's cause of action based on an alleged breach of fiduciary duty arising out of his personal financial dealings with defendant and therefore, affirm that judgment substantially for the reasons expressed by Judge Thompson in his letter opinion of August 4, 1977.
Affirmed.
NOTES
[1] Defendant, as underwriter of the public offering of Levin-Townsend securities, had a duty to the investing public to establish reasonable investigation and reasonable ground to believe the accuracy of the registration statement under § 11 of the Securities Act of 1933, 15 U.S.C.A. § 77k. See Feit v. Leasco Data Processing Equipment Corp., 332 F. Supp. 544, 581-582 (D.N.Y. 1971).