223 N.J. Super. 548 (1988)
539 A.2d 309
KOPP, INC., PLAINTIFF-APPELLANT,
v.
UNITED TECHNOLOGIES, INC., OTIS ELEVATOR COMPANY AND THOMAS HEDEN, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 12, 1988.
Decided March 3, 1988.
*551 Before Judges MICHELS, SHEBELL and ARNOLD M. STEIN.
William C. Rindone, Jr. argued the cause for appellant (Liebowitz & Liebowitz, attorneys; William C. Rindone, of counsel and on the letter brief).
Harold I. Braff argued the cause for respondents (Braff, Ertag, Wortmann, Harris & Sukoneck, attorneys; Harold I. Braff, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Plaintiff Kopp, Inc. appeals from a summary judgment of the Law Division entered in favor of defendants United Technologies, Inc. (United), Otis Elevator Company (Otis) and Thomas Heden (Heden). Plaintiff instituted this action against United, its wholly-owned subsidiary, Otis and its group real estate manager, Heden, after Otis refused to execute a contract of sale containing an assignment of a lease with purchase options for real property located in Mahwah, New Jersey.
The facts necessary to a resolution of the issues raised on this appeal can be summarized generally as follows. On or about August 21, 1973, Otis entered into a 20-year lease of certain lands and improvements located in Mahwah, New Jersey. In addition to this leasehold estate, Otis also owned a fee interest in an adjacent parcel of unimproved property. In the summer of 1983, United authorized Otis to sell its interest in these properties and negotiations commenced with two prospective purchasers; plaintiff, through its president Martin Kopp (Kopp), a real estate entrepreneur now deceased, and representatives from a New York firm known as Meringoff & Shidler (a predecessor of "440 Franklin Associates", the ultimate purchaser of these property interests, hereinafter referred to as the "440 Group").
*552 Negotiations on behalf of Otis were handled exclusively by Heden, a United group real estate manager responsible for "conduct[ing] negotiations for the acquisition and disposition of real estate for selected groups within United Technologies as well as of the parent." Initially, negotiations with plaintiff and the 440 Group occurred simultaneously and Heden advised both parties that there were other bidders involved. Additionally, it became apparent to Otis at this time that the 440 Group was willing to pay a considerable amount more for the property than plaintiff was willing to pay. However, although Otis and the 440 Group reached a preliminary agreement at an early stage of discussions, further dealings between these parties did not resume until mid-September 1983, approximately two months later.
Despite the fact that plaintiff would not meet the 440 Group's offer, Otis and plaintiff arrived at an agreement on price and the method of payment sometime in May or June, 1983. Although dealings between plaintiff and Otis were somewhat sporadic at first, negotiations proceeded steadily from mid-September through November 1983. During this time, negotiations primarily focused upon plaintiff's ability to exercise purchase options under the proposed contract and the quality of title which plaintiff would receive thereunder.
The critical juncture in the Otis-Kopp negotiations occurred sometime around the beginning of October, 1983. Prior to that date, Kopp had retained two New Jersey attorneys, Michael Feltman, Esq. (Feltman) and Myron Rosner, Esq. (Rosner), to work out the contractual terms with Otis and to simultaneously negotiate a sublease agreement with a prospective tenant, Pezrow. Feltman, who was responsible for negotiating the Pezrow lease, had been advised by Kopp early on not to prepare a lease until "[he] (Kopp) [was] absolutely certain that [he] [was] going to make this deal with Otis." When the parties met on October 4, 1983, and Kopp expressed concern "that there would be something that would intervene to prohibit them from going forward", Heden advised him "that [he] was not *553 having any negotiations with anyone at that date, at that time" but reiterated, on several occasions, "that [he] couldn't guarantee them anything and the best way to resolve and make sure there were no open questions was to have documentation completed and signed." Sometime thereafter, Kopp advised Feltman to begin preparing the Pezrow lease.
Negotiations culminated on November 28, 1983, in a meeting between Heden and Kopp at an Otis factory in Yonkers, New York. At this meeting the parties reviewed the document drafts which had been approved by Kopp and his attorney. After additional modifications were made to the contract, Kopp expressed an intention to accept this document as the final form of contract and agreed to initial the modifications and sign on behalf of plaintiff. However, since Heden was not authorized to sign the contract on behalf of Otis, he merely affixed his name as a witness to Kopp's signature.
Pursuant to United's policy, the only persons having the authority to bind Otis to real estate contracts were the president and vice-presidents of Otis North American. As such, the parties originally agreed that Heden would take the partially executed contract to the United/Otis main offices in Farmington, Connecticut in order to have Vice President Richard M. Whiston (Whiston) review the contract and sign on behalf of Otis. However, in order to ensure a prompt response, Kopp decided to personally take the documents and meet Heden at the Farmington offices the following morning.
On the morning of November 29, 1983, Kopp arrived at the Farmington offices with the documents and a check. After Kopp and Heden conducted additional discussions regarding the timing of the purchase option, a memorandum of understanding was drawn up and typed upon Whiston's personalized stationery bearing the United/Otis letterhead. However, since Whiston was engaged in conferences that morning, Heden notified Whiston's secretary that Kopp was there and that these documents were now available for his [Whiston's] review.
*554 Before a final review of the Otis-Kopp contract could take place, however, Heden received a phone call from representatives of the 440 Group who indicated that they were now willing to purchase the property for $300,000 to $400,000 more than plaintiff. Heden apprised Kopp of these new circumstances and asked him whether he would be willing to match this offer. Kopp declined and negotiations between plaintiff and Otis immediately terminated. Defendants subsequently sold the property to the 440 Group.
Plaintiffs instituted this action to recover both compensatory and punitive damages as a result of defendants' failure to execute the contract for the sale of the Mahwah property. Plaintiff grounded its claim on breach of contract as well as various tort theories, alleging fraudulent misrepresentation and interference with its contractual rights and prospective economic advantage. After extensive pre-trial discovery proceedings concluded, Judge Follender in the Law Division granted summary judgment in favor of all defendants on all counts of the complaint. The trial court held essentially that since the agreement had never been signed by an authorized officer of Otis, plaintiff's claims grounded in contract were barred by the Statute of Frauds. Accordingly, the trial court reasoned that plaintiff's claims based on theories of tortious interference with contract and prospective economic advantage must also fall. This appeal followed.

I.
Plaintiff contends that the trial court erred in granting summary judgment because there were genuine issues of material fact and defendants were not entitled to judgment as a matter of law. We disagree. Although summary judgment is a stringent remedy, it should be granted where the pleadings, depositions, answers to interrogatories and affidavits, if any, show that there are no genuine issues as to any material fact challenged and that the moving party is entitled to judgment as *555 a matter of law. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74 (1954); Miller v. U.S. Fidel. & Guar. Co., 127 N.J. Super. 37, 40-41 (App.Div. 1974); Rankin v. Sowinski, 119 N.J. Super. 393, 399-400 (App.Div. 1972); Eisen v. Kostakos, 116 N.J. Super. 358, 370-371 (App.Div. 1971). The purpose of summary judgment procedure is, with proper adherence to the rules, to avoid trials which would serve no useful purpose and to afford deserving litigants immediate relief. Judson v. Peoples Bank & Trust Co. of Westfield, supra, 17 N.J. at 77. Here, the pleadings, depositions, certifications and documents submitted on the motion do not raise any genuine issues of material fact. Consequently, the trial court was not precluded from adjudicating the legal consequences to be drawn from these undisputed facts. See Miller v. U.S. Fidel. & Guar. Co., supra; United States v. General Instrument Corp. et al., 87 F. Supp. 157, 165 (D.N.J. 1949). Summary judgment, therefore, was appropriate.

II.
We are convinced that the trial court properly concluded that plaintiff's claim was barred as a matter of law by the Statute of Frauds. N.J.S.A. 25:1-5, which is commonly referred to as the Statute of Frauds, provides, in pertinent part, that:
No action shall be brought upon any of the following agreements or promises, unless the agreement or promise, upon which such action shall be brought or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto by him lawfully authorized:
d. A contract or 1 sale of real estate, or any interest in or concerning the same;
1. Probably should read "for."
We agree with the trial court that the Otis-Kopp contract was never executed by or on behalf of Otis or its parent United. Heden, who witnessed the document, did not sign it on behalf of Otis, nor did he have either express or implied authority to do so. Therefore, under the circumstances, plaintiff's contractual *556 claim against defendants is barred by the signatorial requirements of the Statute of Frauds.
Notwithstanding the fact that the contract was not executed by either Otis or United or anyone on their behalf, however, plaintiff contends that the action taken by it with respect to the Pezrow sublease after being assured by Heden that no other negotiations were taking place constituted partial performance which would take the contract out of the Statute of Frauds.
Preliminarily, we would note that there is nothing in the record that indicates Heden expressly promised to deal exclusively with plaintiff. Although Heden had told Kopp on October 4, 1983, that "he was not having any negotiations with anyone at that time", he reiterated several times that he "could not guarantee them anything" without documentation. Moreover, Heden's "assurance" that he "was not having any negotiations with anyone else at that time" does not establish grounds for invoking promissory estoppel. Plaintiff's efforts in negotiating and preparing the Pezrow lease were not bargained for nor requested as consideration by any of the defendants nor did plaintiff abandon any existing right by negotiating with Pezrow. Heden repeatedly told Kopp that he could not guarantee the permanency of the parties' status prior to execution of the documents and, therefore, Kopp, a real estate entrepreneur who had employed counsel to handle not only the Pezrow lease but also the Otis-Kopp contract, should have been aware of the risk that this deal, as any deal, would not be finalized.
Furthermore, the preparation of the Pezrow lease did not constitute "part performance" sufficient to take this case out of the Statute of Frauds. Cf. Grabow v. Gelber, 138 N.J. Eq. 586, 591-592 (Ch.Div. 1946); DeMarco v. Estlow, 18 N.J. Super. 30, 34 (Ch.Div. 1952), aff'd o.b. 21 N.J. Super. 356 (App.Div. 1952). It is fundamental that in order to take the case out of the Statute of Frauds on the basis of part performance, the acts relied upon must be other than ancillary or merely *557 preparatory to the contract. See Kufta v. Hughson, 46 N.J. Super. 222, 229 (Ch.Div. 1957). Here, of course, defendants did not induce plaintiff to change its position by directing it to obtain the sublease with Pezrow as a condition for the purchase of the property. To the contrary, plaintiff negotiated and prepared the sublease with Pezrow under the assumption that a contract would be executed eventually and, therefore, entered into negotiations with Pezrow at its own risk.
We are also satisfied that neither the signature of Heden as a witness on the November 28, 1983 agreement nor the November 29, 1983 memorandum typed on Whiston's stationery satisfies the Statute of Frauds so as to effectively bind Otis to the contract. Although plaintiff argues that "at no time during [the] negotiations did defendant Heden ever announce, indicate or even imply that he did not have full and complete authority to complete the transaction on behalf of defendant", there is no proof in the record that Heden ever represented that he had such authority. Moreover, according to Whiston, Heden had no express or implied authority to sign the contract on behalf of Otis since company policy mandates that real estate contracts be signed by the president or a vice-president of Otis. The record establishes that neither Heden nor Whiston nor any other officer of United or Otis ever made affirmative representations that Heden had the full and complete authority to bind Otis. Consequently, Otis is not estopped to deny the execution of the contract.
Even assuming that Heden had apparent authority to bind Otis to a contract, the events of November 28, 1983, clearly vitiated any grounds for reliance upon that fact by plaintiff. Kopp knew on November 28th that he had to go to Connecticut the following day to execute the contract and, consequently, plaintiff cannot claim reliance upon Heden's signature as a witness on the contract or any representations that Heden might have made up to that date regarding his authority to bind his principals. Heden did not sign the contract on *558 behalf of Otis. Rather, he simply affixed his name under the printed word "attest" which he crossed out and substituted with the word "witness" opposite to the signature of Kopp.
Finally, we hold that the unsigned letter memorandum of November 29, 1983 did not satisfy the Statute of Frauds merely because it was typed upon Vice President Whiston's personalized stationery bearing the United/Otis letterhead. There was no present intention that the printed names on the letterhead be adopted and used as an authenticating signature. At the time the letter memorandum was drawn up, the parties were still waiting for Whiston to review and execute the underlying contract. Although the letter states "Otis is today executing an agreement with you [plaintiff]", the parties understood that such execution was contingent upon approval by Whiston, who had neither read the contract nor the letter memorandum at the time it was typed up. Thus, there is no indication from the surrounding circumstances that defendants intended the letter memorandum to constitute anything more than a clarification of the terms reached as a result of the November 28th meeting. This was not sufficient to meet the signatorial requirements of the Statute of Frauds.

III.
Plaintiff also contends that the trial court erred in dismissing its tort claims because they were only addressed in defendants' reply brief filed in connection with the summary judgment motion. The trial court considered these arguments and determined that as a matter of law claims grounded on tort theories could not stand in the absence of a valid contract between the parties. We agree.
It is well-settled that "[r]ecovery upon the theory of unlawful interference with a contract, where the contract if it existed would be unenforceable by virtue of the statute of frauds, is opposed to the spirit of that statute and may not be allowed." C.B. Snyder Realty Co. v. Nat. Newark, etc., Banking Co., 14 *559 N.J. 146, 164-165 (1953). See also McCann v. Biss, 65 N.J. 301, 310-312 (1974) (holding that a real estate broker who is precluded from recovering sales commissions under the statute of frauds is also barred from accomplishing this result indirectly by claiming wrongful interference with income expectancy). Thus, since the Kopp-Otis agreement was not enforceable under the Statute of Frauds, plaintiff's action for tortious interference with that contract, or the economic advantage to be gained from it, cannot stand.
Additionally, it is fundamental to a cause of action sounding in tortious interference with contractual obligations that the claim be directed against a third party. A party cannot be guilty of inducing the breach of its own contract. See Robbins v. Ogden Corp., 490 F. Supp. 801, 810 (S.D.N.Y. 1980); Garshman v. Universal Resources Holding, Inc., 641 F. Supp. 1359, 1374 (D.N.J. 1986), aff'd 824 F.2d 223 (3d Cir.1987). See also Borbely v. Nationwide Mut. Ins. Co., 547 F. Supp. 959 (D.N.J. 1981) (holding that insurance agents could not sue their former employer for wrongful interference with contract after defendant decided to discontinue business in New Jersey since "[g]enerally, this cause of action requires a tripartite situation wherein a third party intentionally and maliciously interferes with a present or prospective relationship between two other parties ..." Id. at 976). As such, plaintiff's claims based on tortious interference with a contractual right growing out of the Kopp-Otis dealings cannot stand.
Finally, we point out that it is essential in any action based on tortious interference with economic advantage that such interference be malicious; a factor which plaintiff has failed to demonstrate in this case. In Levin v. Kuhn Loeb & Co., 174 N.J. Super. 560 (App.Div. 1980), the plaintiff, a former president of a company which leased business machines, alleged that he was ousted from this position when the defendant investment banking firm which was handling the company's financial affairs refused to underwrite a particular public offering. *560 In rejecting the contention that the defendant's refusal to go through with the executory underwriting contract constituted an actionable tort of interference with prospective economic advantage, we found that plaintiff did not demonstrate the necessary element of malice, i.e., "the intentional commission of wrongful act without justification or excuse." Id. at 573. As in the case at bar, we noted in Levin that the defendant was not under a contractual obligation to complete the public offering, and:
[h]ence defendant plainly had the absolute right to withdraw from the underwriting. Since defendant had that right, the exercise thereof constituted ample justification for its action and cannot result in the imposition of tort liability. Id. at 574.
See also Rothermel v. International Paper Co., 163 N.J. Super. 235 (App.Div. 1978), certif. den. 79 N.J. 487 (1979) (finding no cause of action to exist against defendant paper manufacturer for refusing, in the absence of a contract, to continue supplying plaintiff distributor with product for lucrative resale profits since "[t]hat which one has a right to do cannot become a tort when it is done." Id. at 244); Cf. Glasofer Motors v. Osterlund, Inc., 180 N.J. Super. 6, 26 (App.Div. 1981).
The standard by which to determine whether conduct is malicious or not was set forth in Kurtz v. Oremland, 33 N.J. Super. 443 (Ch.Div. 1954) wherein the court observed that a "[w]rongful act connotes any act which will, in the ordinary course, infringe upon the rights of another to his damage, except and unless it be done in the exercise of an equal or superior right." (Emphasis added). Id. at 455. Here, following the principles discussed in Levin and Rothermel, we conclude that since Otis did not have a contractual obligation to sell the Mahwah property to plaintiff, plaintiff's failure to obtain the benefits of the Kopp-Pezrow sublease could not have been the result of any "malicious" interference by or on the part of Otis. To the contrary, Otis' decision to reject plaintiff's offer was not based on any malice toward plaintiff, but was motivated by the simple fact that the 440 Group was offering $300-400,000 *561 more for the same property. Such conduct is not only reasonable; it is not legally actionable.
In Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173 (App.Div. 1978), certif. den. 77 N.J. 510 (1978), which involved a real estate broker's suit for commissions, we held that "[i]f the alleged tortfeasor acted out of sheer malice, he will be liable on that account. If he acted out of a motivation to enhance his financial position  for profit, then it is necessary for recovery that his conduct must have been transgressive of generally accepted standards of `socially acceptable conduct.'" Id. at 189. However close plaintiff and Otis may have come to executing a contract, Otis did not breach any contractual obligation owed to plaintiff by taking a better offer from another party at the last minute. As the Federal District Court acknowledged in Garshman, "`[i]ntended but purely incidental interference resulting from the pursuit of the defendant's own ends by proper means [is not] actionable.' Robbins, supra, 490 F. Supp. at 811." Garshman, 641 F. Supp. at 1374.
Accordingly, the summary judgment under review is affirmed.