MICHAEL HALEBIAN N.J.,
INC., Plaintiff,

v.

ROPPE RUBBER CORPORATION, et
al., Defendants.

Civ. A. No. 87-3919 (HAA).

United States District Court,
D. New Jersey.

June 12, 1989.

Douglas S. Eakeley, Riker, Danzig, Scherer & Hyland, Morristown, N.J., for Michael Halebian N.J., Inc.

Philip White, Lee Adlerstein, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Newark, N.J., for J. Bernardo Distributors, Inc.

Ann G. McCormick, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., Jonathan E. Thackeray, Baker & Hostetler, Cleveland, Ohio, for Roppe Rubber Corp.

Marc Pergament, Levin, Weinberg, Raley & Pergament, P.C., Garden City, N.Y., for Salesmaster Associates, Inc.

HAROLD A. ACKERMAN, District Judge.

THE COURT: On November 29, 1988, plaintiff Michael Halebian, N.J. Inc., filed its amended complaint against defendants Roppe Rubber Corp., Salesmaster, Inc., J. Bernardo Distributors, Inc. and Allstate Rubber Company, Inc., in which it alleged that the defendants, either singly or collectively, violated the state and federal antitrust laws, engaged in unfair competition and breach of contract, tortiously interfered with plaintiff's prospective economic advantage and induced the breach of contract. On February 22, 1989, plaintiff consented to dismiss its claims against Allstate. On February 3rd and 27th and March 3, 1989, defendants Roppe, Salesmaster and Bernardo filed their respective motions for summary judgment.

Summary judgment may be granted if, drawing all inferences in favor of the non-

movant, the pleadings, affidavits and admissions on file demonstrate that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Chipollini v. Spencer Gifts*, 814 F.2d 893, 896 (3rd Cir.), *cert. dism'd*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." *See Miller v. Indiana Hospital*, 843 F.2d 139, 143 (3d Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons, et al.*, 871 F.2d 409, 419 (3d Cir. 1989). A fact is material if it influences the outcome of the legal issue under the governing substantive law. *See Anderson, cited supra*, 477 U.S. at 248, 106 S.Ct. at 2510. Hence, a material fact, as the Supreme Court in *Anderson* pointed out, is identified by reference to the substantive law. *Id.*

The moving party bears the initial burden of identifying admissible evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once that burden has been met, the nonmoving party must come forward with evidence, while not necessarily presented in an admissible form, which shows that there is a genuine issue for trial, or it will be defeated on the motion. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Federal Rule of Civil Procedure 56(e).

Since this matter is before me on motions of defendants for summary judgment, I shall view the factual record before the Court in a light most favorable to the nonmoving plaintiff. *See T.J. Trauner Associates v. Cooper Benton, et al.*, 820 F.2d 643 (3d Cir.1987).

Viewing the facts in this way, the record before the Court reveals that plaintiff, Michael Halebian N.J. ("Halebian") is a New Jersey based distributor of, *inter alia*, flooring products manufactured by companies such as Mercer Plastics and Johnson Rubber. *See* plaintiff's response to Allstate's Interrogatory No. 23 and Salesmaster's Interrogatory No. 2. It is a major distributor of such products and the largest in New Jersey. In all but one instance plaintiff purchased its stock from manufacturers rather than distributors, and sells its merchandise on a nonretail basis. *See* Mr. Halebian's deposition at Page 639; plaintiff's response to Salesmaster's Interrogatory No. 9(b).

Defendant Roppe Rubber Company ("Roppe"), an Ohio based company, which has manufacturing facilities in Ohio and Florida and produces, among other products, rubber cove base. *See* the deposition of Frederick Jacobs at Page 8. Cove base is the molding attached at the intersection of a wall and the floor in the interior of a building. At least twelve other companies manufacture this product. *See* plaintiff's response to both Salesmaster's Interrogatory No. 9 and Allstate's Interrogatory No. 12.

Roppe sells its product through a system of independent authorized distributors whose clients are generally architects, contractors and builders. *See* Mr. Jacobs' affidavit at Paragraphs 1–4. Prior to 1984, Roppe's only distributor in the New York–New Jersey Metropolitan Area was Allstate, which is located in Ozone Park, New York. In 1984, Roppe granted a distributorship to Salesmaster, located in Westbury, Long Island. *See* the affidavit of Steven Kurtz, dated February 24, 1989, Paragraphs 1, 4–5. Roppe considers these two distributors as assigned to the New York–New Jersey Metropolitan Area. Mr. Halebian describes these entities as being among the principle distributors of floor products and that Salesmaster and Halebian are among the largest. *See* Mr. Halebian's deposition at 117–20, 123–24.

Of interest here as well is a third distributor of Roppe products, J. Bernardo Dis-

tributors, Inc., which is located in Pitts-town, Pennsylvania, and has served customers primarily located in the Allentown/Easton/Phillipsburg area since 1986. *See* Mr. Joseph Bernardo's deposition at 30–34.

While the distributors state that they were never assigned a territory or told to restrict their sales to a particular geographical area, *see* deposition of Mr. Kurtz at 114; Mr. Jacobs at 67; Mr. Bernardo at 43–44; Mr. Gilbert Szabo at 63, 69, Roppe apparently envisioned that its distributors would sell its products to the areas which they could most effectively service. *See* Jacobs' affidavit at Paragraph 2; Roppe's response to Plaintiff's Interrogatories No. 1, 6. The record reflects that Roppe distributors were expected to carry the full line of products, make certain presentations to promote the product, provide samples and install and maintain the base and resolve warranty claims and complaints. In light of these performance requirements, Roppe believed that its distributors had "more or less defined trading territory." *See* deposition of Gilbert Szabo at 81–82.

Roppe frowns upon sales by unauthorized distributors since they are not trained in the installation and maintenance of the product and secure sales by virtue of the services that authorized distributors provide. By "free-riding" on the efforts of authorized dealers, unauthorized distributors deprive authorized distributors of sales they might otherwise obtain.

A central issue in this case is whether or not Roppe had a uniform policy against sales by authorized distributors to unauthorized distributors or Roppe products for distribution in other geographical areas. This type of selling is known as transhipping. When such sales occur, Roppe contends that the unauthorized distributor, or bootlegger, acquires cove base in one territory for distribution in another and reaps the benefits from the sales and promotional efforts of authorized distributors in that second territory. *See* Jacobs' affidavit at Paragraphs 3–4.

According to Steven Kurtz, who is the president of Salesmaster:

"I understood that distributors like Salesmaster are not to sell to . . . distributors who sell or acquire a product through unauthorized channels for distribution in areas already secured by authorized dealers."

Kurtz affidavit at Paragraph 6. As stated previously, Kurtz acknowledged, however, that he was never formally assigned a territory. *See* his deposition at Page 114.

Apparently, Mr. Jacobs, vice president of Roppe, contends that Roppe had a policy that prohibits distributors from selling Roppe products to unauthorized subdistributors. *See* his affidavit at Paragraph 2. *See also* his deposition at 36–38, in which he stated that in 1984, Roppe had a policy pursuant to which "sales were not to be made to unauthorized distributors outside his territory," and that authorized distributors were to "concentrate their sales efforts within their primary area of responsibility," and were to inform Roppe of subdistributor-arrangements established in a distributor's territory. *See* Mr. Jacobs' deposition at 38. As noted above, however, the representatives of various distributors state that they were never formally apprised of such policies but rather assumed that there were limitations with respect to the territory they were to or had the ability to service.

On various occasions since 1983, plaintiff has asked to become a Roppe distributor. *See* plaintiff's response to both Allstate Interrogatory Nos. 11, 24, 27 and 28, and Salesmaster's Interrogatories Nos. 21, 25, as well as Mr. Halebian's deposition at Page 636. According to Michael Halebian, such a distributorship is important because his company has been otherwise unable to provide its customers with Roppe cove base, "the base of choice," because of its quality and price, and as a result those customers must purchase the products from Salesmaster and/or Allstate, thereby giving those entities access to customers who would not otherwise purchase any products from them. *See* plaintiff's response to Roppe Interrogatory No. 14; Mr.

Halebian's certification, dated April 10, 1989, at Paragraphs 4–5; Mr. Szabo's deposition at 31–38; plaintiff's response to Allstate's Interrogatories Nos. 13, 14, 20 and 28; deposition of Mr. Fred Jacobs at 14.

In its attempt to obtain a Roppe distributorship, by letter dated April 9, 1984, Michael Halebian, Sr. wrote Roppe's president, Donald Miller, regarding Halebian's interest in serving as a Roppe distributor and its view that it had the ability to handle the product. In response, by letter dated May 5, 1984, Mr. Miller denied Halebian's request on the ground that

"if we were to sell to [Halebian] that action could have a devastating effect on Allstate. We are their major line. Twenty years ago we could not find a distributor for our products in the New York City area. Allstate took a chance on Roppe.... [T]he problem is that adding a distributor of your size could cause too many serious problems at this time."

Interestingly, later, in 1984, Salesmaster became Roppe's second distributor in the New York area, purportedly based on Roppe's "need." *See* Mr. Jacobs' deposition at 67.

Following Roppe's unilateral refusals to grant plaintiff's request for a distributorship, in 1985, plaintiff attempted to purchase Roppe cove base from Salesmaster. *See* plaintiff's response to Salesmaster Interrogatory No. 24; Mr. Jacobs' affidavit at Paragraph 6. Apparently, plaintiff did not purchase any products from Salesmaster.

Subsequently, in December of 1986, J. Bernardo Distributors sought to sell cove base to other distributors. Mr. Bernardo first contacted Tabor Company, which is located in Kenilworth, New Jersey. *See* deposition of Mr. Joseph Bernardo at 49. Tabor's president, Jack Sharpe, declined the offer but informed Mr. Bernardo that Halebian was interested in obtaining Roppe products. *See* Mr. Halebian's deposition at 151–53. Thereafter, Halebian learned of Bernardo's interest in selling Roppe cove base to other distributors, and Harry Chakmakian of Halebian called Bernardo, informed him that Halebian had been unsuc-

cessful in its attempts to obtain a Roppe distributorship, and was interested in purchasing Roppe base. During that call, the parties arranged to meet to discuss the proposed purchases in mid-January, 1987, during the trade's "market week" convention in Atlanta, Georgia.

Mr. Halebian recalled that at their meeting in Georgia

"I told [Bernardo] that we could possibly sell half a million dollars worth a year, and if he made a ten percent profit, that would mean $50,000 a year profit to him, so he mentioned that he might have a problem with the money, and I told him I would pay him as soon as I got his invoice. He was very interested. We were interested, and then he gave me a price.

\*　　\*　　\*　　\*　　\*　　\*

He gave me his price list, less 22 percent.

\*　　\*　　\*　　\*　　\*　　\*

... he was looking to sell and we were looking to buy, so we negotiated a deal, which wasn't a firm deal until it was confirmed in writing."

On this point, the following examination ensued at his deposition:

"Question: Why do you say it was not a firm deal until he confirmed it in writing?

"Answer: Because I was asking for 22, and he wanted to give me 20.

"Question: Was anything else left open?

"Answer: No."

Deposition of Michael Halebian at 159–60, 163–65.

With respect to delivery, Bernardo told Halebian that Bernardo

"comes to our area every two or three weeks for the pickup of tackless and other items."

*See Id.* at 62. There were no discussions regarding Bernardo's transportation capacity.

As to the volume of sales, Mr. Halebian initially told Bernardo to expect Halebian

to request 500 cartons. *See Id.* at 164. On this point, the following colloquy ensued:

"Question: Did you make any commitment to him, that you would maintain that kind of volume?

"Answer: That was an estimated figure that I gave him which I thought I could keep.

"Question: Did you promise him that you would buy a half million dollars from him a year?

"Answer: I didn't promise him, no.

\* \* \* \* \* \*

"Question: Did you promise him that you would buy any particular volume from him?

"Answer: No."

*See Id.* at 167–68. *But see* deposition of Mr. Bernardo at 63 where he stated that Halebian never indicated during these conversations the amount it would purchase.

With respect to the duration of this purchasing arrangement, Mr. Halebian testified that

"Answer: As far as I know, it was as long as we wanted.

"Question: Was it terminable by Mr. Bernardo at any time?

"Answer: That's not the understanding I had.

"Question: Was the understanding that it would last forever, as long as you wanted to buy?

"Answer: Yes.

"Question: As long as you were willing to submit orders and pay for them, Mr. Bernardo agreed he would fill them. Is that correct?

"Answer: Right.

"Question: And that would go on until the end of time?

"Answer: I imagine so.

"Question: Did you consider that Mr. Bernardo at any point would have the right to get out of the deal?

"Answer: As long as it was done legally, I would have no choice."

*See* Mr. Halebian's deposition at 165–66. Later in his deposition, a related exchange ensued:

"Question: Did you consider that you had any obligation to buy all of the Roppe product that you wanted from Bernardo?

"Answer: What kind of obligation?

"Question: Well, did you have an agreement with him that you were going to buy all your Roppe product from him?

"Answer: I was going to buy all my Roppe products from him, yes.

"Question: If that were so how could you then think that you might be able to get it directly from Roppe? That would cut out Bernardo. Isn't that correct?

"Answer: It would, yes.

"Question: And you thought you had a right under your agreement with Bernardo to do that. Is that correct?

"Answer: That's correct.

"Question: In other words, you could end your relationship with him any time you wanted to and buy it directly from Roppe?

"Answer: If I got it direct from Roppe, yes, I would have, I would have stopped.

\* \* \* \* \* \*

"Question: Did you tell Mr. Bernardo at the time that you dealt with him on this matter that you had attempted to get the line directly from Roppe and failed?

"Answer: Yes, I mentioned that to him.

"Question: When did you tell him that?

"Answer: At our first meeting."

*See* Mr. Halebian's deposition at 652–54.

Halebian believed that Roppe would eventually discover its purchasing arrangement with Bernardo by virtue of Bernardo's increased sales. *See Id.* at 636. Moreover, he expressed a hope that its successful sale of Roppe products he obtained from Bernardo would entice Roppe to allow Halebian to purchase directly from Roppe. *See Id.* at 652–53.

On January 21, 1987, Mr. Bernardo sent Mr. Halebian a copy of the Roppe price list with a letter in which he stated that Halebian's "price will be list less 22 percent with

2 percent 10 days. This will be a delivered price." *See* letter of Joseph Bernardo to Michael Halebian dated January 21, 1987. Halebian states that this letter "confirms their agreement." *See* Mr. Halebian's deposition at 59.

Shortly prior to receipt of the letter, Mr. Halebian received 30 samples of Roppe products from Bernardo. *See* his deposition at 17.

By purchase order dated January 28, 1987, plaintiff ordered 490 cartons of almost all types of Roppe cove. *See* Mr. Bernardo's deposition at 109. The invoice slip of that date reflects that 190 cartons were shipped and the remainder was back ordered; that is, since Bernardo lacked the stock to fill the entire order, he had to obtain additional merchandise from Roppe. *See* Mr. Bernardo's deposition at 94, 109; Mr. Halebian's deposition at 62, 115, 192; Exhibits B and C to the declaration of Lee Adlerstein, Esq. Shortly after placing the order, on or about February 1, 1987, Mr. Halebian notified its major customers that he carried Roppe base. *See* his deposition at 189–90.

Halebian waited three weeks for the delivery of the remainder of his order. When it failed to arrive, Mr. Halebian called Mr. Bernardo. Mr. Bernardo informed him that his company had not received shipment from Roppe and that he would call Roppe. According to Mr. Halebian, later that day Bernardo called Halebian and told him that Roppe did not forward its order because of problems with Bernardo's credit line, to which Halebian responded that he would send $10,000. *See* Mr. Halebian's deposition at 194, 640.

Thereafter, Bernardo spoke with Halebian for a third time that day, at which time he told Halebian that he spoke with Mr. Szabo of Roppe who informed Bernardo that Roppe "did not like" him making sales outside his territory as it threatened the distributors in that area, and for that reason, and allegedly because of the great volume of the order, Bernardo could not provide the rest of the order. *See* deposition of Joseph Bernardo at 63, 94.

It seems that during this period, in January of 1987, Salesmaster's president, Steven Kurtz, received a copy of a Roppe price list that its customer, Baer Rug, had obtained from Halebian. *See* Mr. Kurtz's deposition at 124–25. Upon receipt of the list, Kurtz recalled feeling surprised because he did not know Halebian sold Roppe products. *See* Mr. Jacobs' deposition at 45. Thereafter, he called Fred Jacobs to determine if Roppe had "taken on a new distributor" and "to find out if [Jacobs] knew what was going on." *See* Mr. Kurtz's deposition at 127; Kurtz affidavit at Paragraph 8; Jacobs' affidavit at Paragraph 7. Jacobs informed Kurtz that Roppe had sold no products directly to Halebian. *See* Mr. Jacobs' deposition at 35. Kurtz then informed Jacobs that he had obtained "a price list ... from Michael Halebian in which he is selling ... Roppe cove base at the identical prices on the [Salesmaster] price list." *See* Mr. Kurtz's deposition at 27; Mr. Jacobs Deposition at 50–51; Mr. Kurtz's affidavit at Paragraph 8. Halebian admits that the list distributed replicated Salesmaster's prices. *See* his deposition at 172–75, 178, 189–90.

Jacobs asked Kurtz to send Roppe a copy of the list. *See* Mr. Jacobs' affidavit at Paragraph 7; Mr. Kurtz's affidavit at Paragraph 9; Mr. Kurtz's deposition at 127. Thereafter, Kurtz sent Jacobs the list accompanied by a note that stated:

"Fred

"as we discussed, please keep me informed.

"SK"

*See also* Mr. Kurtz's deposition at 128; Jacobs deposition at 52.

While Salesmaster did not request Roppe to search for and eliminate Halebian's source, *see* deposition of Steven Kurtz at 173–74, Mr. Jacobs' deposition at 43, it appears that in February of 1987, Roppe representative Gilbert Szabo learned from Joseph Bernardo that Bernardo had sold Roppe cove base to Halebian and that Szabo asked Bernardo to cease such sales since Halebian was not an authorized dealer. *See* Jacobs' deposition at 60; his affidavit at Paragraph 8; Szabo's deposition at

82; Kurtz's affidavit at Paragraph 10; Bernardo's deposition at 123–24. *See also* plaintiff's answer to Salesmaster's Interrogatory No. 21, in which plaintiff states that Bernardo told its representatives that Mr. Szabo "told him that Roppe did not permit Bernardo's sale of rubber cove base to Halebian because it felt compelled to protect its distributors in other areas. Bernardo agreed to discontinue the sales, at least in part, because he could not financially handle the volume Halebian requested." *See* his deposition at 124. Bernardo discontinued the sales arrangement, however, despite his concurrently held belief that the sales to Halebian were appropriate since they were expected to result in the increased sale of Roppe products. *See* Mr. Jacobs' deposition at 60.

Jacobs then called Kurtz and informed him that Halebian would no longer be selling Roppe goods. *See* Jacobs' deposition at 95. While Kurtz never explicitly discouraged Roppe from making Halebian a distributor, *see* Jacobs' deposition at 96, the evidence reveals that Halebian is among Salesmaster's biggest competitors and it did not want competition from Halebian, particularly in light of the expansions Salesmaster had made to accommodate the Roppe line for sales in the New York area. *See* Mr. Kurtz's deposition at 37, 122; his affidavit at Paragraph 7, 11.

As a result of the termination of the sales arrangement between Bernardo and Halebian, plaintiff filed the instant suit in which defendant presently seeks the entry of summary judgment in its favor.

In Counts 1 and 2, plaintiff contends that defendants conspired to restrain trade and create a monopoly in the distribution of Roppe products in violation of federal and state antitrust laws. In support of the entry of summary judgment on these counts, defendants argue Roppe's conduct in enforcing a policy against transhipping did not constitute an unlawful conspiracy. Moreover, Roppe asserts that even if the Court concludes that Roppe had agreed with its distributors not to sell products to plaintiff, such conduct was not anticompetitive in purpose and effect, but rather is a vertical nonprice restriction, which is an appropriate trade restriction under the rule of reason since it promotes competition.

In addition, Roppe asserts that a claim that it has engaged in an unlawful monopoly must fail as a matter of law since it has a natural, and thus lawful monopoly over its own products. Moreover, defendants assert that Roppe lacked the specific intent to make Salesmaster a monopolist in cove base distribution particularly in light of the existence of another competitive Roppe distributor and other cove base-distributors in the area.

In response, plaintiff argues that Roppe's purported policy against transhipping is pretextual and if the trier of fact rejects the explanation for defendant's conduct, it will question whether or not Roppe acted independently. Plaintiff further asserts that defendants Bernardo and Salesmaster's refusal to deal is illegal *per se*, as Salesmaster encouraged Roppe to stop Bernardo, another distributor, from dealing with plaintiff, in an effort by Salesmaster to eliminate competition. Moreover, plaintiff contends that defendants' agreement is illegal under the rule of reason because Roppe produces one dominant product in the relevant market, which cannot be substituted or purchased from any other distributor in the state. And, finally, as the claim of unlawful monopolization involves an analysis of intent, an issue about which there is a factual dispute, summary judgment, plaintiff claims, must be denied.

In Counts 1 and 2, plaintiff alleges that defendants violated Section 1 of the Sherman Act, 15 U.S.C., Section 1 and N.J.S.A. 56:9–3, respectively. As these provisions essentially mirror one another, and as the state cases look to federal decisions for guidance, I shall treat these claims together for the purposes of this motion. *See Glasofer Motors v. Osterlund, Inc.*, 180 N.J.Super. 6, 21–6, 433 A.2d 780 (App.Div. 1981); *Finlay & Assoc., Inc. v. Borg–Warner Corp.*, 146 N.J.Super. 210, 221–22, 369 A.2d 541 (L.Div.1976), *aff'd*, 155 N.J.Super. 331, 382 A.2d 933 (App.Div.), *certif. denied*, 77 N.J. 467, 391 A.2d 483 (1978).

These provisions make unlawful "every contract combination ... or conspiracy in restraint of trade." 15 U.S.C. Section 1, N.J.S.A. 56:9–3. To demonstrate that defendants have violated Section 1 of the Sherman Act plaintiff must prove:

1. that defendants contracted, combined or conspired together;

2. that the combination or conspiracy produced adverse, anticompetitive effects within the relevant product and geographic markets;

3. that the conspiracy affected international commerce;

4. that the objects of and conduct pursuant to that contract or conspiracy unreasonably restrained trade; and

5. that plaintiff was injured as a proximate result of that conspiracy.

See Englert v. City of McKeesport, 872 F.2d 1144, 1149–50 (3d Cir., 1989); Nanavati v. Burdette Tomlin Memorial Hospital, 857 F.2d 96, 117 (3d Cir.1988), cert. denied, —— U.S. ——, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989).

To establish the existence of a contract or conspiracy among the defendants "there must be evidence that tends to exclude the possibility that the [defendants] were acting independently.... [T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." See Monsanto Co. v. Spray–Rite Serv. Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984), quoting Edward J. Sweeney & Sons, Inc. v. Texaco, 637 F.2d 105, 111 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Put succinctly, there must be a "meeting of the minds" of the defendants and not just the occurrence of unilateral or independent activity. See Englert, supra, at 1150 (citations omitted); Link v. Mercedes–Benz of North America, 788 F.2d 918, 922 (3d Cir.1986). Plaintiff bears the burden of introducing "evidence that tends to exclude the possibility that the manufacturer and ... distributor were acting inde-

pendently." See Link, cited supra, at 923. Absent proof of concerted action "a manufacturer has a right to deal or refuse to deal with whomever it likes as long as it does so independently." See Monsanto, cited supra, 465 U.S. at 761, 104 S.Ct. at 1469.

In addition to demonstrating that the defendants engaged in concerted conduct, plaintiff must also show that the agreement falls in one of the categories of per se illegality or that it has an actual or at least probable anticompetitive effect. See Malley Duff & Associates v. Crown Life Ins. Co., 734 F.2d 133, 140 (3d Cir.1984), cert. denied, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984). See also Business Electronics v. Sharp Electronics, 485 U.S. 717, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988). In Fragale & Sons Beverage Co. v. Dill, 760 F.2d 469, 473 (3d Cir.1985), the Court of Appeals for the Third Circuit recognized that in general

"concerted activity under Section 1 is unlawful only if it violates the rule of reason; that is the conspiracy 'produces adverse, anticompetitive effects within relevant product and geographic markets.' Martin B. Glauser Dodge Co. v. Chrysler Corp., 570 F.2d 72, 81 (3d Cir. 1977), cert. denied, 436 U.S. 913 [98 S.Ct. 2253, 56 L.Ed.2d 413] ... (1978). Some types of concerted activity, however, because of their pernicious effect on competition and lack of any redeeming virtue,' are treated as per se violations of Section 1, without any inquiry into the harm such activity may have caused in the relevant market. Northern Pacific Railway Co. v. United States, 356 U.S. 1, 15 [78 S.Ct. 514, 523, 2 L.Ed.2d 545] ... (1958). Examples of concerted business practices that courts have labeled as per se violations include price-fixing and classic group boycotts. See, e.g., United States v. Socony–Vacuum Oil Co., 310 U.S. 150 [60 S.Ct. 811, 84 L.Ed. 1129] ... (1940) (price-fixing); Malley Duff & Assoc. v. Crown Life Ins. Co., 734 F.2d 133, 142 (3d Cir.1984) (group boycotts) [as well as resale price maintenance, tying arrangements and certain types of recip-

rocal dealing. *Malley Duff, supra,* at 140].''

As it appears that the challenged conduct does not constitute a vertical price restraint and as the arrangement at issue is not horizontal, *see Business Electronics,* I shall examine the challenged conduct under the rule of reason.

As stated previously, under a rule of reason analysis, "a plaintiff must show anticompetitive effect in the relevant product and geographic markets." *See Malley Duff, supra,* at 139–40. Moreover, the court must scrutinize the purpose and competitive effect of each agreement to determine its lawfulness. *See Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139, 147 (3d Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982). As Justice Brandeis observed in the *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918),

> "The true test of legality [of a restraint evaluated under the rule of reason] is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable; the history of the restraint; the evil believed to exist; the reason for adopting the particular remedy; the purpose or end sought to be attained, are all relevant facts."

The inquiry regarding the reasonableness of the restraint should also include consideration of "the percentage of business controlled, the strength of the remaining competition [and] whether the action springs from business requirements or purpose to monopolize." *Times Picayune Publishing Co. v. United States,* 345 U.S. 594, 615, 73 S.Ct. 872, 884, 97 L.Ed. 1277 (1953). Relatedly, the court must examine the relevant product market, which, for the purposes of Section 1, involves an examination of the patterns of competition as a means for

judging whether the restraint at issue is unreasonable.

In sum, a conclusion that a restraint of trade is unreasonable may be

> "based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices. Under either branch of the test, the inquiry is confined to a consideration of impact on competitive conditions."

*National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

■ With respect to the first element, plaintiff has introduced evidence that, viewed in a light most favorable to it, may arguably exclude the possibility that the defendants acted independently. The record reflects that the president of Salesmaster spoke to the vice president of Roppe concerning plaintiff's sale of Roppe products. Following this conversation, Roppe personnel spoke with representatives at Bernardo and requested that Bernardo stop selling Roppe products to plaintiff. Arguably, this evidence reflects the joint interactions among Salesmaster, Roppe and Bernardo and hence plaintiff has introduced evidence that may arguably exclude the likelihood that Roppe's conduct was unilateral and not concerted.

Moreover, the record is unclear as to whether defendants' conduct was actually motivated by the policy against transhipping, especially as there exist factual disputes as to the existence of an explicit and enforced policy.

The depositions of the principals of Salesmaster and Bernardo reveal that at no time were they explicitly informed that Roppe prohibited such transactions. Moreover, a principal of Roppe himself admitted that such a mandate was never expressly imposed. In addition, the record reflects that these distributors and others sold Roppe products not only in their primary selling region but also beyond them, albeit somewhat infrequently, without penalty. As this evidence at least generates questions

as to whether or not defendants' policy against transhipping accurately reflects the reasons for defendants' conduct, summary judgment should not be entered since if the jury believed these portions of the evidence, it would discount the likelihood that the conduct had procompetitive effects. I so conclude, cognizant of the line of cases that hold that an independently imposed policy against transhipping is not unreasonable. *See Beach v. Viking Sewing Mach. Co., Inc.,* 784 F.2d 746, 750 (6th Cir.1986); *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604, 605 (4th Cir.1985); *Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786, 790–92 (5th Cir.1982). At this stage of the case, however, viewing the evidence in favor of plaintiff, plaintiff has adduced sufficient evidence which bars excluding the possibility that Roppe acted independently.

For these reasons, I shall deny defendants' motion for summary judgment on Counts 1 and 2 of plaintiff's complaints to the extent they state claims under Section 1 of the Sherman Act and N.J.S.A. 56:9–3.

In Counts 1 and 2, plaintiff also alleges that defendants have conspired to create a monopoly in the distribution of Roppe products in violation of 15 U.S.C. Section 2, and N.J.S.A. 56:9–4. Trade is monopolized when a few persons, acting together, obtain the power to control the prices of a commodity moving in interstate commerce or obtain the power to exclude competition for customers of that product. *See American Tobacco Co. v. United States,* 328 U.S. 781, 811, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Section 2 forbids any person or combination from monopolizing or attempting to monopolize any part of interstate commerce and thereby sanctions conduct that seeks to restrain trade via a monopoly. *See Klors, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 210–11, 79 S.Ct. 705, 708–09, 3 L.Ed.2d 741 (1959).

■ To prove that such a monopoly violates Section 2, plaintiff must show that the defendants (1) possessed monopoly power in the relevant market and (2) wilfully acquired or maintained that power, rather than obtained that power "from growth or

development as a consequence of a superior product, business acumen or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Englert, supra,* at 1150. In addition, specific intent to monopolize the relevant market is a necessary element of a conspiracy to monopolize. *See Fleer, cited supra,* at 153. Such intent may be inferred, for example, from proof of actual monopoly power.

In *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.,* 579 F.2d 20, 26 (3d Cir.), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978), the court of appeals observed that

"The 'monopoly' condemned by Section 2 of the Sherman Act inheres in the power to control prices or exclude competition. To the extent that competition from related products limits the market power of an entity with a dominant position in one product, such an entity is less likely to be found to hold 'monopoly' power forbidden by law. This is so because the ongoing competition from other products guards against the ability of the dominant entity to increase prices and makes exclusionary tactics by such parties fruitless, impossible or unbearably expensive. Thus, in resolving the proportion of the 'market' controlled as a prelude to an examination of the extent of a firm's power to control prices or exclude competition, the courts look to the range of commodities reasonably interchangeable by consumers for the same purposes."

*See also Fleer, cited supra,* at 154. Of course, this range of substitutes "must be drawn narrowly to exclude any other products to which, within reasonable variation in price, only a limited number of buyers will turn. . . ." *See Times–Picayune Publishing Co., supra,* 345 U.S. at 612 n. 31, 73 S.Ct. at 882 n. 31.

As Chief Justice Warren observed in *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), speaking in a Section 7 case,

"The outer boundaries of a product market are determined by the reasonable

interchangeability of use or the cross elasticity of demand between the product itself or substitutes for it. However, within this broad market, well defined submarkets may exist for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of submarket as a separate economic entity, the product's peculiar characteristics or uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors."

This analysis has been adopted in the Section 2 context. *See Grinnell Corp.*, *cited supra*, 384 U.S. at 572, 86 S.Ct. at 1704.

The existence of monopoly power may be inferred, for example, by possession of the predominant share of the market. *See Grinnell*, at 572, 86 S.Ct. at 1704. The relevant product and geographic market; that is, the area of effective competition within which the parties operate, is a question of fact. *See Standard Oil Co. v. United States*, 337 U.S. 293, 299, 69 S.Ct. 1051, 1055, 93 L.Ed. 1371 (1949); *Ad–Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1341 (11th Cir.1987); *Mesirow v. Pepperidge Farm, Inc.*, 703 F.2d 339, 345 (9th Cir.), *cert. denied*, 464 U.S. 820, 104 S.Ct. 83, 78 L.Ed.2d 93 (1983); *Dimmitt Agri Industries, Inc. v. CPC International, Inc.*, 679 F.2d 516, 527 (5th Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1349 (3d Cir.1975); *Columbia Metal, cited supra.*

Under Section 2, the relevant product market is defined in light of the existence of competitors as evidence of countervailing power which would preclude monopolization. *See Fleer, cited supra*, at 148, Footnote 13; *Columbia Metal, cited supra*, at 27, Footnote 11. For the purposes of this motion the parties agree that the relevant product market is Roppe cove base and the relevant geographic market is the New York–New Jersey Metropolitan Area. *See* Roppe's brief in support of its motion at 2 n. 2; plaintiff's brief in opposition thereto at 5.

There is no question that defendant Roppe has a monopoly over its own product and while it is questionable whether the natural monopoly of a manufacturer over the distribution of its products is actionable, *see Riddell, cited supra*, at 791 and cases cited therein, it is arguable that Roppe could conspire with Salesmaster to enable Salesmaster to gain monopoly power in the relevant market. The record, however, fails to demonstrate that Salesmaster has obtained, or has a dangerous probability of achieving, such market power. *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 (3d Cir.1975) (discussing elements of offense of an attempt to monopolize). First, it competes with Allstate in the sale of Roppe cove base. Second, it competes with distributors of cove base that other companies manufacture. The presence of rivals who compete against Salesmaster for sales of Roppe cove base, as well as bases produced by other manufacturers, reflects that competition in that market is not foreclosed. Thus, I find that plaintiff has failed to demonstrate that Salesmaster obtained the monopoly power in the relevant market and has failed to adduce evidence that Salesmaster is likely to do so. Thus, plaintiff has not produced sufficient evidence to survive summary judgment on its monopoly claim.

For these reasons, I shall grant defendants' motion of summary judgment on Counts 1 and 2 of plaintiff's complaints to the extent they state claims under Section 2 of the Sherman Act and N.J.S.A. 56:9–4.

In Count 3, plaintiff asserts that Roppe induced Bernardo to breach its contract with plaintiff. Defendant Roppe argues that this claim must fail because plaintiff has not proven the existence of a valid contract, as it is oral and was not to be performed within one year from its making. Moreover, defendant claims that even if there had been a valid contract, Roppe's enforcement of its policy against transhipping required Bernardo to terminate its dealings with plaintiff and as such a policy did not violate the law, its enforcement did

not constitute unlawful interference with any contract.

In response, plaintiff argues that there was a written contract between plaintiff and Bernardo, which was to continue on an indefinite basis. Plaintiff further asserts that the purported basis for Roppe's conduct presents a disputed factual assertion and whether or not it was the true basis for defendants' actions, and, hence, excused its conduct, is a question of fact.

In order to obtain relief upon a claim for tortious interference with contract, plaintiff must prove

(1) the existence of a contract;

(2) that the defendant actually interfered with the contract;

(3) that the defendant was not a party to the contract but rather was a third party;

(4) that the defendant intentionally and maliciously, and hence unreasonably interfered with the relationship between the contracting parties;

(5) that the defendant's conduct caused plaintiff damage.

*See Kopp, Inc. v. United Technologies, Inc.,* 223 N.J.Super. 548, 558–59, 539 A.2d 309 (App.Div.1988) (and cases cited therein); *Norwood Easthill Assoc. v. Norwood Easthill Watch,* 222 N.J.Super. 378, 384–85, 536 A.2d 1317 (App.Div.1988); *Glasofer, cited supra,* 180 N.J.Super. at 26, 433 A.2d 780. *See also System Operations v. Scientific Games Development Corp.,* 425 F.Supp. 130, 133–34 (D.N.J.1977).

■ That the underlying contract may be unenforceable is no defense to a claim of tortious interference. *See Mina L. Smith, Inc. v. Cyprus Industrial Minerals Co.,* 178 N.J.Super. 7, 15, 427 A.2d 1114 (App.Div.1981). As Chief Justice Weintraub observed in *Harris v. Perl,* 41 N.J. 455, 461, 197 A.2d 359 (1964):

"Since men usually honor their promises no matter what flaws a lawyer can find, the offender should not be heard to say the contract he meddled with could not have been enforced. Accordingly, it usually is held that contracts which are voidable by reason of the Statute of Frauds, formal defects, lack of consideration, lack of mutuality or even uncertainty of terms, still afford a basis for a tort action when the defendant interferes with their performance."

(Citations omitted, quotation marks omitted). *Accord Louis Schlesinger Co. v. Rice,* 4 N.J. 169, 180, 72 A.2d 197 (1950) in which the Supreme Court of New Jersey stated that:

"One who maliciously or without justifiable cause induces a person to break his contract with another will be liable to the latter for the damages resulting from such a breach and this is so even though the contract be unenforceable because [it is] within the Statute of Frauds."

Thus, observations in *Kopp, cited supra,* 223 N.J.Super. at 558–59, 539 A.2d 309 and *C.B. Snyder Realty Co. v. National Newark & Essex Banking Co.,* 14 N.J. 146, 164–65, 101 A.2d 544 (1953), to the contrary do not accurately reflect the state of the law on this point and defendant's reliance on same to support their defense to plaintiff's tort claim, I find, is without basis.

■ Turning now to an analysis of the record in light of the law, it is arguable that viewing the facts in a light most favorable to the plaintiff, plaintiff and Bernardo had a purchasing arrangement. Without passing judgment on whether same amounted to an enforceable contract, it appears that agents of defendant Roppe, who are not parties to the purchasing arrangement between plaintiff and Bernardo, expressed disapproval to defendant Bernardo as to its decision to supply plaintiff with Roppe products, and as a result, Bernardo cancelled its dealings with plaintiff.

At issue is whether or not this intentional conduct constituted malicious interference, or, put differently, was a wrongful act committed without justification or excuse and one that "in the ordinary course, infringe[d] upon the rights of another to his damage, except and unless it be done in the exercise of an equal or superior right." *See Louis Schlesinger, cited supra,* 4 N.J. at 181, 72 A.2d 197. As stated previously, the viability of defendant Roppe's explanation for its conduct, i.e., enforcement of its

policy against transhipping, is a disputed factual issue. Again, the plaintiff presents evidence, that if believed by a jury, would require a rejection of this explanation as a justification of defendant's conduct. Thus, in light of this factual issue, defendants' motion for summary judgment on Count 3 must and will be denied.

In Count 4, plaintiff asserts that Roppe tortiously interfered with plaintiff's prospective economic advantage. Defendant Roppe asserts that since the tort involves proof that defendants' sole motive was to injure plaintiff, and as defendant acted pursuant to its policy against transhipping, it was motivated by legitimate factors and hence plaintiff cannot prove defendant committed this tort. In response, plaintiff argues that there is a dispute as to whether or not defendant's interference via its purported enforcement of the policy against transhipping was in reality wrongful intimidation of Bernardo and thus summary judgment must be denied.

Under New Jersey law, the tort of intentional interference with prospective economic advantage is established if plaintiff proves

1. the existence of a reasonable expectation of economic advantage;

2. defendant had knowledge of that expectation of economic advantage;

3. that the defendant wrongfully without justification interfered with plaintiff's reasonable expectation of economic advantage or benefits;

4. in the absence of the wrongful act of the defendant, it is reasonably probable that plaintiff would have realized its economic advantage or benefit; and

5. plaintiff sustained damage as a result of defendant's action.

*See Zippertubing Co. v. Teleflex, Inc.*, 757 F.2d 1401 at 1409 (3d Cir.1985).

Viewing the record before the court in a light most favorable to the plaintiff, it appears that as Roppe coving is the coving of choice for architects, contractors and other professionals, a reasonable inference may be made that a nonretail distributor who has Roppe products in his stock is likely to attract customers it would not otherwise have and hence plaintiff's expectation that obtaining the product from Bernardo would be economically beneficial is reasonable.

Moreover, the record is clear that Roppe became aware that plaintiff gained access to this desirable product and knew that a distributor who sold it would likely experience increased sales. Absent interference with its arrangement with Bernardo, the record supports the inference that plaintiff would have probably obtained an economic benefit from sales of Roppe coving and plaintiff's inability to obtain the product would diminish its sales or possibly cause losses on orders it may have taken.

Finally, there is at least a disputed issue as to whether defendant Roppe's action to halt Bernardo's supply to Halebian was in any way justified. As stated previously, defendant Roppe's proffered explanation for interfering with plaintiff's arrangement was in furtherance of its policy against transhipping.[1] While there is suspicion that such an explanation exempts it from liability,

In Counts that Roppe conspired to induce breach of contract and to interfere with plaintiff's

---

1. In one of the cases in which I believe Roppe cited in support of its position on this point, and my memory may be faulty, I believe it cited the case of *Sustick v. Slatina* [48 N.J.Super. 134, 137 A.2d 54 (1957) ], in that case, if my memory is correct, the New Jersey court described the essence of the tort as being, as to whether the defendant played by the *rules of the game*.

What I have found here is that applying Rule 56 standards on the record before me, in light of the contention made here by the plaintiff, there is a genuine issue of material fact on this issue and the jury could reasonably find that the defendants did not play by the rules of the game.

prospective economic advantage. Since the viability of this claim requires proof that the act in which defendant conspired to engage was unlawful, *see, e.g., Lopez v. Swyer,* 62 N.J. 267, 276, 300 A.2d 563 (1973), and as that underlying issue involves factual disputes not properly resolvable in this case in the context of summary judgment, defendants' request that I do so is denied.

In Count 5, plaintiff alleges that defendant Salesmaster engaged in unfair competition. Salesmaster argues that the facts fail to establish a prima facie case in support of this claim since Salesmaster has neither appropriated or misappropriated any of plaintiff's products. Moreover, defendant argues that an assertion of attempted monopolization cannot form the basis of an unfair competition claim. In response, plaintiff asserts that the cause of action of unfair competition seeks to prevent "dirty tricks" and promote fair play and Salesmaster's admission that it did not want competition from Halebian for the sale of Roppe Rubber cove base and its inquiry to Roppe itself upon learning that Halebian obtained a source for sa▓ demonstrates that Salesmaster enga▓ unfair competition.

A review of this count ▓ amended complaint reveals ▓ seeks recovery fro▓ ▓ on the ground▓ ▓ ▓usiness.

As forme▓ ▓udge Stern acknowledged in *Kyriazi v. Western Electric Co.,* 461 F.Supp. 894, 950 (D.N.J.1978):

"Where one intentionally acts to deprive another of an economic benefit, ..., the law of New Jersey confers a right of action on the party aggrieved, since the common law has long recognized the interest and right of every man to freely engage in such lawful business or occupations as he himself may choose, free from hindrance or obstruction from his fellow man."

(Citations and quotation marks omitted.) *See also System Operations, supra,* at 134 *quoting Louis Kamm, Inc. v. Flink,* 113 N.J.L. 582, 587 (E & A 1934).

To the extent that plaintiff asserts that defendant Salesmaster prevented plaintiff from freely engaging in his business and, hence, seeks relief for that defendant's malicious interference with plaintiff's business, an actionable tort, plaintiff must prove (1) that the defendant actually interfered with plaintiff's business and (2) that defendant's conduct was wanton, malicious and unjustifiable. *See Raymond v. Cregar,* 38 N.J. 472, 479–80, 185 A.2d 856 (1962); *Kyriazi, supra* at 950; *Louis Schlesinger, supra.*

Viewing the record in a light most favorable to the plaintiff, it is arguable that a jury could infer that Salesmaster's call to Roppe was done in an effort to eliminate competition that plaintiff may have posed from the sale of Roppe products. This inference is reasonable in light of statements of Salesmaster's president that he did not relish the thought of plaintiff's competition in the Roppe market. The justifiability of Salesmaster's effort to cut off ▓intiff's supply of Roppe products de▓s upon the proof as to Salesmaster's ▓" as a Roppe dealer and whether the ▓ves its actions were in further-▓oppe's policy against tranship-

▓s plaintiff has introduced evidence from which, if believed, it may be inferred that this explanation is pretextual, plaintiff has carried its burden on summary judgment on this claim. Therefore, I shall deny defendant's request for summary judgment on Count 5 of the complaint to the extent that it asserts a claim for malicious interference with plaintiff's business.

In Count 6, plaintiff asserts that defendant Bernardo engaged in a breach of contract. In response to this allegation, Bernardo asserts that as it had no indefinite obligation to ship plaintiff unlimited quanti-

ties of Roppe cove base, the agreement was terminable by either party at will. Moreover, Bernardo asserts that as the purported agreement lacked mutuality and specificity, and did not comport with the Statute of Frauds, the parties did not have an enforceable contract. Finally, Bernardo asserts that as it could not obtain the cove base to fill plaintiff's order, the contract claim must fail pursuant to the doctrine of impossibility of performance.

In response to Bernardo's request for summary judgment on this claim, plaintiff argues that the record reveals that plaintiff and Bernardo entered into a requirements contract of indefinite duration and that the agreement could be terminated only upon the independent decision of a third party to add Halebian as a distributor.

As the agreement at issue involves the sale of goods, its enforcement is governed by Section 2 of the Uniform Commercial Code, codified at N.J.S.A. 12A:2–201, et seq. Section 2–201 provides:

"(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

"(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

"(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable.

"(a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

"(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

"(c) with respect to goods for which payment has been made and accepted or which have been received and accepted."

Hence, to obtain relief for its breach plaintiff must first demonstrate that the contract was enforceable and satisfies the statute. The satisfaction of the Statute of Frauds is a legal determination. *See California Natural, Inc. v. Nestle Holdings, Inc.*, 631 F.Supp. 465, 471 (D.N.J.1986).

Plaintiff relies on a letter from Joseph Bernardo to Harry Chakiman of plaintiff as satisfying the Statute of Frauds.

The letter, in its entirety, is as follows:
"January 21, 1987
"Attention Harry
"Enclosed are Roppe price sheets. Your price will be list, less 22 percent or 2 percent 10 day. This will be a delivered price.
"Please feel free to call if I can be of assistance with this matter.
"Cordially.
"Joe Bernardo."

Enclosed with the letter was a six-page document entitled "Price List Rubber and Vinyl Flooring Products Effective March 1, 1986."

In addition to this letter, the record reflects that on January 28, 1987, plaintiff submitted a purchase order for 490 cartons of Roppe products. An invoice of that date reflects that Bernardo shipped 190 cartons and back ordered the remainder, apparent-

ly for shipment upon receipt of the delivery from the supplier.

██ The purchase order and invoice, however, do not satisfy the Statute of Frauds since they are not writings in confirmation of the contract, do not indicate that an agreement had been entered into between the parties and they lack the signature of the party to be charged. *Trilco Terminal v. Prebilt Corp.*, 167 N.J.Super. 449, 454, 400 A.2d 1237 (L.Div.1979), *aff'd,* 174 N.J.Super. 24, 415 A.2d 356 (App.Div. 1980); *Huyler Paper Stock Co. v. Information Supplies Corp.*, 117 N.J.Super. 353, 362–63, 284 A.2d 568 (L.Div.1971).

██ As the parties do not, and cannot contend that Bernardo's performance does not take their UCC governed arrangement out of the Statute of Frauds, *see Huyler, supra,* at 360, 284 A.2d 568, the agreement will be found to comport with the statute only if the January 21, 1987 letter satisfies the statute.

A writing that satisfies 2–201 must

1. indicate that a contract for sale has been made;

2. contain the essential terms of the contract, but of course will not fail for indefiniteness under the UCC if one or more of the terms are missing; and

3. is signed by the party against whom enforcement is sought.

*Simmons Oil Corp. v. Bulk Sales Corp.*, 498 F.Supp. 457, 462 (D.N.J.1980); *Sutton v. Lienau,* 225 N.J.Super. 293, 300, 542 A.2d 473 (App.Div.), *certif. denied,* 111 N.J. 650, 546 A.2d 559 (1988); *Cohn v. Fisher,* 118 N.J.Super. 286, 292–94, 287 A.2d 222 (L.Div.1972). The writing is necessary only to evidence the contract; it need not constitute it.

A review of the letter indicates that the parties had reached an agreement whereby plaintiff may purchase Roppe products which will be delivered to plaintiff at a price, as set forth on the enclosed list, less 22 percent with an additional 2 percent reduction if paid within 10 days. Hence, the writing implies that there would be successive purchases of Roppe products at the above-mentioned prices.

While the agreement does not set forth the duration, the code fills in this provision. Specifically, Section 2–309(2) provides that

"Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party."

Plaintiff contends that the agreement was to continue indefinitely, until such time as plaintiff may be able to obtain Roppe directly. Assuming this view is accurate, or, alternatively, assuming that the price agreement under which Bernardo would supply plaintiff with Roppe products when ordered, the code provides that the agreement "may be terminated at any time by either party."

Hence, taking the record as a whole, in light of the code, while the duration of the arrangement is not written in the contract, the agreement does not violate the statute despite its absence. Finally, the letter bears the signature of the president of Bernardo and hence is signed by the party charged with performance. Thus, for these reasons, I conclude that the January 21, 1987 letter evidences a contract for the sale of goods and comports with 2–201.

██ Moreover, the subsequent placement of the purchase order, and Bernardo's delivery of almost one-half the order, and back order of the remainder may be construed as the parties' recognition of the contract. Section 2–207(3) provides that

"Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act."

Hence, even if the writings were insufficient to establish a contract, the subsequent conduct of the parties in this case, viewing the facts in a light in favor of the plaintiff, would establish its existence.

Similarly, plaintiff's conduct following receipt of the January 21, 1987 letter, may be construed as an acceptance of Bernardo's offer to sell plaintiff Roppe products. On the other hand, the placement of the purchase order may be construed as an offer to buy goods which invites acceptance by the shipment of goods. *See* 2–206(1)(b). The subsequent delivery of part of the goods ordered and the notification that the remainder had been back ordered may in this instance be construed as acceptance. Hence, for all these reasons, plaintiff has carried its burden in demonstrating at least issues of fact as to whether Bernardo and plaintiff entered into an enforceable contract.

At issue is the viability of plaintiff's claim that "Bernardo breached its contract to sell Roppe cove base to Halebian." *See* amended complaint at Paragraph 29. As stated previously, the record viewed in light of the code reveals that the agreement was terminable at will by either party and hence Bernardo's decision to discontinue further sales was not a breach. The question remains, however, as to whether its failure to fill the partially unfilled purchase order is excused. Bernardo says its conduct is excused pursuant to the doctrine of impossibility of performance. In this regard, section 2–615 states that

"Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance

"(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

"(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allo-cate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

"(c) The seller must notify the buyer seasonably that there will be delay or non-delivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer."

Roppe's instruction to Bernardo that it discontinue sales to this unauthorized dealer affected the seller's entire capacity to perform, but there is an issue as to whether this occurrence made performance impracticable. There is no doubt that the agreement between plaintiff and Bernardo was implicitly premised on the propriety of Bernardo's sale of a product to an unauthorized distributor and hence the nonoccurrence of an impediment to this conduct "was a basic assumption upon which the contract was made." The record, however, is unclear as to whether or not a policy against transhipping existed and if it constitutes the basis for Bernardo's inability to perform, particularly in light of Joseph Bernardo's remarks that he was relieved by not having to fill Halebian's large orders. As there is a question of fact as to whether defendant's nonperformance was excusable, I must and will deny defendant's request for the entry of summary judgment on Count 6 of the complaint.

For all of the above reasons I shall grant defendant's motion for summary judgment on Counts 1 and 2 to the extent they state claims under 15 U.S.C. Section 2 and N.J.S.A. 56:9–4 and deny all defendants' motions for summary judgment in all other respects.